UNITED STATES, Appellee

v

EARL W. RINEHART, Lieutenant Commander,
U. S. Coast Guard, Appellant

8 USCMA 402, 24 CMR 212

No. 9647

Decided November 15, 1957

Lieutenant Commander Albert S. Frevola argued the cause for Appellant, Accused. With him on the brief was Lieutenant Commander Ricardo A. Ratti.

*Commander William L. Morrison* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Henry A. Cretella.*

## Opinion of the Court

HOMER FERGUSON, Judge:

This case requires us to revisit a familiar scene we had recently left in United States v Fowle, 7 USCMA 349, 22 CMR 139; United States v Estrada, 7 USCMA 635, 23 CMR 99; and United States v Holmes, 7 USCMA 642, 23 CMR 106. In those cases it was the trial counsel's reference, during the presentencing proceedings, to the Secretary of the Navy's Instructions regarding separation from the service of persons convicted of larceny, which we found objectional. Here, however, it is prosecution's reference to paragraph 33*h*, Manual for Courts-Martial, United States, 1951, which is involved.[1]

The accused pleaded guilty to and was convicted of several charges containing multiple specifications alleging the offenses of conspiracy to commit larceny, larceny, wrongful appropriation, violation of a lawful general regulation, and wrongful association with enlisted men, all in contravention of specific Articles of the Uniform Code of Military Justice. Prior to deliberation on sentence, the defense had offered in evidence forty-six documents, which included fitness reports, letters from prominent citizens in various communities in which the accused had been stationed, and affidavits from former commanding officers. Collectively these documents attested to the accused's outstanding moral character, excellence in the performance of his official duties, and the high general esteem in which he was held in the community. The accused took the stand and testified under oath concerning his sixteen years of unblemished continuous active duty service in the Coast Guard. During this period he had risen to the rank of lieutenant commander. He acknowledged the "mistakes" he had made—which resulted in his court-martial conviction —and informed the court that he "would give or do anything to be able to correct these mistakes and be per-

---

[1] Paragraph 33*h* provides as follows:

"If he [the accused's commanding officer] determines that some punishment should be adjudged against the accused, but that punishment under Article 15 is not appropriate or has in a proper case been refused by the accused, he must decide to which kind of court-martial the case should be referred. Subject to jurisdictional limitations, charges against an accused, if tried at all, should be tried at a single trial by the lowest court that has the power to adjudge an appropriate and adequate punishment. See 33*l*. The fact that, upon conviction of a particular offense, the Table of Maximum Punishments (127*c*) may authorize a punishment in excess of that which can be adjudged by a summary or special court-martial does not in itself preclude reference of such an offense to a summary or special court-martial for trial. In this connection, see 15*a* and 16*a* as to the authority to cause a capital case to be tried by an inferior court-martial. He should take into consideration the character and prior service of the accused, as well as the established policies of superior authority, in deciding upon his action or recommendation. For example, he should not hesitate in a proper case involving offenses of a purely military nature, to dismiss the charges (32 *d*) or refer them to an inferior court-martial for trial. *When any offense charged is not of a purely military nature, he should take into account the fact that the retention in the armed forces of thieves and persons guilty of moral turpitude injuriously reflects upon the good name of the military service and its self-respecting personnel.* If he determines that the offense is so serious that the accused, if convicted, should be separated from the service by a punitive discharge, he must decide to which court the case should be referred in order that the appropriate kind of discharge—dishonorable or bad conduct—may be adjudged. In this connection, see 76*a* (6) and (7). Ordinarily, a specification as to which the statute of limitations (Art. 43) apparently may be successfully pleaded should not be referred for trial. See 68*c*." [Emphasis supplied.]

mitted to remain in the service." Individual civilian counsel then concluded the defense's presentence presentation by imploring the court-martial to "find some way to punish him without dismissing him from the service."

The assistant trial counsel then proceeded to address the court-martial concerning what would constitute "an appropriate and adequate sentence in this case." He first directed the court's attention to paragraph 76a(5) of the Manual, supra, which discusses "inadequate sentences."[2] He told the court as follows:

"I may point out to you for your use in determining the seriousness of the charges in this case, paragraph 33h of the Manual which states that retention in the armed forces of thieves and persons guilty of moral turpitude injuriously reflects upon the good name of the military service and its self-respecting personnel."

Following this reference to the Manual, the assistant trial counsel informed the court that he would like to read "some very brief quotes concerning the status of a commissioned officer from the JAG Journal of June 1949." The law officer, however, ruled that "quotations from miscellaneous publications may not be read before the court." The court was then advised by the law officer as to the maximum sentence authorized. Before closing, the president of the court directed the following question to the law officer:

"PRES: May I interrupt before you close the court. The court wishes to be advised of any recent policy promulgated by the Commandant in respect to sentences of courts-martial, in cases of this nature.

"LO: The ruling of the law officer is that introduction of any such policy at any stage of the trial would be reversible error; and accordingly, the request of the President may not be granted."

The court then closed to deliberate on the sentence. Some two and one-half hours later the court reopened and the president requested the law officer to furnish the court with information pursuant to paragraph 76a(4), Manual, supra, concerning "the penalties adjudged in other cases for similar offenses."[3] The law officer denied the request pointing out that "the members are to reach a fair and just applicable sentence based on the facts of this particular case," and that the "facts of any other case would be completely extremeness [sic] as well as highly prejudicial, to the accused." The president then asked the law officer the "meaning" of paragraph 76a(3), Manual for Courts-Martial, supra.[4] The law officer here advised the court that paragraph 76a(3) was "completely immaterial" because the accused had no record of

---

[2] Paragraph 76a(5) reads as follows:
"The imposition by courts-martial of inadequate sentences upon military persons convicted of crimes which are punishable by the civil courts tends to bring the armed forces into disrepute as lacking in respect for the criminal laws of the land."

[3] Paragraph 76a(4) states:
"Among other factors which may properly be considered are the penalties adjudged in other cases for similar offenses. With due regard for the nature and seriousness of the circumstances attending each particular case, sentences should be relatively uniform throughout the armed forces. In special circumstances, to meet the needs of local conditions, sentences more severe than those normally adjudged for similar offenses may be necessary. Courts will, however, exercise their own

discretion, and will not adjudge sentences known to be excessive in reliance upon the mitigating action of the convening or higher authority. Comments with respect to matters proper for consideration in fixing the punishment are made in other connections. For example, see 123 (Mental impairment or deficiency), 127c (Permissible additional punishments). See also 16b, 126e, 154a, and 174b."

[4] Paragraph 76a(3) states:
"Although evidence of previous convictions may always be considered in determining the proper measure of punishment, evidence of previous convictions of offenses materially less grave than the offense or offenses of which the accused stands convicted is not to be regarded as in itself justifying a sentence of maximum severity."

previous convictions. The court thereafter again retired to deliberate on the sentence, and upon reopening, sentenced the accused to be dismissed from the service and to pay a fine of $500.00.

We granted review in this case to determine whether the assistant trial counsel's reference to paragraph 33*h* of the Manual, supra, prejudiced the accused. We conclude that it did. The principles announced in United States v Fowle, supra, are equally applicable here. In that case the Court said:

"A policy directive may be promulgated to improve discipline; however, it must not be used as leverage to compel a certain result in the trial itself. In United States v Isbell, 3 USCMA 782, 14 CMR 200, we held that a circular which recited a policy respecting the undesirability of retaining thieves in the Army did not violate the law, but we did not hold expressly or impliedly that such a policy statement could be brought into the courtroom to influence the members of the court—irrespective of the particular merits of the case—to assess a punitive discharge. Although we are here faced with a secretary rather than a command directive, the former, emanating from the Secretary of a service, would be even more persuasive and bring more pressure to bear upon the members of the court than the latter type directive. Nor do we believe that once the trial counsel insists that the policy respecting a punitive discharge be 'implemented' with regard to an accused that the prejudice can be removed by the simple expedient of having the president or law officer remind the members of the court that they are not bound by the policy declaration. If everyone is presumed to know that as a general rule thieves should be separated from the service, why parade such information before the members of the court and then turn around and instruct them that they are not bound thereby, if the purpose is not to influence the court to adjudge a punitive discharge? It was against this sort of command influence that the

Code was initially directed. Reasonable men must conclude that once the Secretary of a service enters into the restricted arena of the courtroom, whether the members of the court are conscious thereof or not, he is bound to exert some influence over them. A trial must be kept free from substantial doubt with respect to fairness and impartiality. 'A judicial system operates effectively only with public confidence—and, naturally, that trust exists only if there also exists a belief that triers of fact act fairly.' United States v Stringer, 5 USCMA 122, 17 CMR 122. This appearance of impartiality cannot be maintained in a trial unless the members of the court are left unencumbered from powerful external influences."

A policy directive announced by the Secretary of the Navy in a SECNAV Instruction is indistinguishable in principle from a policy directive contained in the Manual for Courts-Martial, promulgated pursuant to an executive order of the President. Only the source of the reference is different, the prejudice is the same. If anything, the latter would have more persuasive effect upon a court-martial because of the President's role as Commander-in-Chief of the armed forces. Accordingly, we conclude that the accused has been prejudiced by the assistant trial counsel's reference to paragraph 33*h* of the Manual, supra. Whether the sentence imposed in this case is considered appropriate is not for us to decide and we prudently leave that for the court-martial's determination, free of any "powerful external influences."

Our insistence that no policy directives of a superior be brought to the attention of court members during trial has nothing whatever to do with the President's power to formulate matters which a convening authority may consider in determining whether or not a charge should be referred to trial. As a matter of fact, the subject matter of paragraph 33*h*, supra, is applicable to the officer exercising summary court-martial jurisdiction over an accused and has no place at all in the trial. The court members must reach a decision

on the findings and sentence on the basis of the evidence presented and the law officer's instructions and nothing else. Of course counsel may in argument point up inferences which may be permissibly drawn but those arguments also are limited to the evidence adduced at the trial. Insofar as the limits of punishment are concerned, the President under Article 56, Uniform Code of Military Justice, 10 USC § 856, has been given authority to fix maximum limits. This power, however, does not carry with it directly or by implication the right to control court members in fixing an appropriate sentence for the accused before them. In United States v Littrice, 3 USCMA 487, 13 CMR 43, we noted that "Congress expressed an intent to free courts-martial members from any improper and undue influence by commanders which might affect an honest and conscientious consideration of the guilt or innocence of an accused." We believe this same intent is equally applicable on the question of sentence.

One further matter merits discussion. In the recent case of United States v Boswell, 8 USCMA 145, 23 ██ CMR 369, we voiced our disapproval of the practice of permitting court members to consult "outside sources" for information on the law. We there said that "the Manual is no different from other legal authorities. It, too, has no place in the closed session deliberations of the court-martial." It was pointed out that court members may not understand the Manual's passages thereby creating an atmosphere of confusion and doubt during the closed deliberations. What was prophesied in Boswell, supra, has now come to pass. The prosecution in closing argument had directed the court's attention to paragraphs 76a(5) and 33h of the Manual. The court-martial in closed session, and on its own initiative, "discovered" paragraphs 76a(3) and 76a(4) of the Manual, neither paragraph being material in arriving at an appropriate sentence. Thus a virtual race to the Manual had begun in spite of the fact that the law officer had fully and adequately instructed the members on the applicable law pertaining to the sentence.

We cannot sanction a practice which permits court members to rummage through a treatise on military law, such as the Manual, indiscriminately rejecting and applying a myriad of principles—judicial and otherwise—contained therein. The consequences that flow from such a situation are manifest. In the first place, many of the passages contained therein have been either expressly or impliedly invalidated by decisions of this Court. E.g., United States v Cothern, 8 USCMA 158, 23 CMR 382; United States v Johnson, 7 USCMA 488, 22 CMR 278; United States v Greer, 3 USCMA 576, 13 CMR 132; United States v Eggers, 3 USCMA 191, 11 CMR 191; United States v Rosato, 3 USCMA 143, 11 CMR 143; United States v Rushlow, 2 USCMA 641, 10 CMR 139; United States v Wappler, 2 USCMA 393, 9 CMR 23; and United States v Clark, 1 USCMA 201, 2 CMR 107, just to name a few.[5] Secondly, we have consistently emphasized the role of the law officer in the instructional area. In United States v Chaput, 2 USCMA 127, 7 CMR 3, we said that, "It is fundamental that the only appropriate source of the law applicable to any case should come from the law officer." See also United States v Ginn, 1 USCMA 453, 4 CMR 45; United States v Beasley, 3 USCMA 111, 11 CMR 111. Recently in United States v Wilson, 7 USCMA 713, 23 CMR 177, Judge Latimer, speaking on behalf of the Court, said:

"We have said on numerous occasions that it is the law officer who is in charge of the trial proceedings and responsible for its orderly conduct. One of his most important functions is to give adequate, comprehensive instructions on the issues of the case. The trial of a criminal case is not a game to be regulated by the whims of counsel. If we are to build a real system of military justice, we must ensure that the law

[5] For an additional list of Manual provisions which have been invalidated or substantially modified by decisions of this Court, see Feld, A Manual of Courts-Martial Practice and Appeal, Appendix I, page 164.

officer is shouldered with the responsibility of seeing to it that the court-martial members are given proper guideposts to reach a fair and just verdict, . . ."

Thirdly, the great majority of court members are untrained in the law. A treatise on the law in the hands of a nonlawyer creates a situation which is fraught with potential harm, especially when one's life and liberty hang in the balance. We have absolutely no way of knowing whether a court-martial applied the law instructed upon by the law officer or whether it rejected such instructions in favor of other material contained in the Manual. In United States v Chaput, supra, we reversed a conviction where a law officer had referred the court members to several board of review decisions to permit them to determine for themselves the applicable legal principles involved. In the course of our opinion, we said:

". . . Notwithstanding the fact that the law officer acted and was motivated by what he considered to be the best means to inform the court as to the issue under discussion, nevertheless, the members of the court are not learned in the law and they should not be given the responsibility of reading cases to determine the elements of an offense."

In United States v Lowry, 4 USCMA 448, 16 CMR 22, we condemned the practice wherein the law officer, in his instructions, provided the court members with a list of cases for outside reference. We said that if the court-martial is permitted to use them "for the purpose of determining for themselves what law should be applied to the case, then prejudice is present."

In civilian practice it would constitute a gross irregularity to permit jurors to consult outside legal references. A case closely in point is United States v Gordon, — F2d — (CA7th Cir), decided July 16, 1957. There jurors were furnished a pamphlet entitled "Handbook for Jurors," which was prepared for the use of jurors in the Federal courts by the Administrative Office of the United States Courts, upon the direction and under the supervision of the Committee on the Operation of the Jury System upon authorization of the Judicial Conference of the United States. Five United States District Court Judges, who served as members of the Committee which prepared the handbook, were listed. Many of the statements contained therein were erroneous and misleading. The Court of Appeals held that the use of such handbook constituted prejudicial error. In rejecting the Government's contention that the instructions of the court, rather than the generalized observations contained in the handbook, controlled the jury, the court said:

"We are not impressed with the government's argument that any misinformation imparted to the jury by means of the handbook is immaterial because, in any event, the jury was obliged to accept and apply the law as given to it by the court in its instructions. At any rate, it strikes us as a strange philosophy that a juror after he has been called for service can be officially indoctrinated with misleading and inaccurate information on the premise that in the end he will by the court's instructions be properly informed. Neither do we think there is any similarity between the situation where a citizen after he has been selected for jury service is furnished official information with judicial sanction, and a situation where a citizen receives information available to all from a non-official source. After a juror has been selected it is too late to tutor him so that he will become more competent.

"While, as noted, we think the distribution of the handbook was prejudicial to defendant, a more important objection is that its use constituted an impingement upon the jury system, as well as an invasion of the prerogatives of the legislative branch of the government charged with the responsibility of providing qualifications for jurors. This Congress has done. See Title 28 U.S.C.A. Sec. 1861 *et seq*." [See Smith v State, 95 So 2d 525, where the court held it reversible error for the trial judge to permit the jury to

have use of the dictionary while deliberating its verdict. Cf. Posey v State, 234 Ind 696, 131 NE2d 145, where the court disapproved the practice of permitting the jury to have access to law books during their deliberations. See also Commonwealth v Townsend, 167 Pa Super 71, 74 A 2d 746, where the court held that the trial judge's refusal to submit to the jury for their consideration two opinions of the United States Supreme Court was correct.]

We see no compelling reason why a similar rule should not be adopted in courts-martial practice. All the law a court-martial need know in order to properly perform its functions must come from the law officer and nowhere else.

We are fully aware that the change in the system of military law occasioned by this decision represents a substantial departure from prior service practices. However, we cannot but feel that such change was imperatively needed if the system of military law is to assume and maintain the high and respected place that it deserves in the jurisprudence of our free society. Prior to the Code courts-martial were neither instructed on the elements of the offense charged nor the principles of law applicable to the case. The deliberations of the court were in camera and a genuine need then existed for the use of the Manual by the court members in determining the law to be applied. However, with the advent of the Uniform Code of Military Justice many of the problems which previously existed under the old system disappeared. Congress created the role of law officer and fashioned him in the image of a civilian judge. He was charged with the responsibility of instructing the court on the elements of the offense and the applicable principles of law in order that informed and intelligent findings and sentence could be reached. In a word, he was made a fountainhead of the law in the court-martial scheme of things. The sum total of these and other remedial changes inaugurated by the Code was to bring court-martial procedure, wherever possible, into conformity with that prevailing in civilian criminal courts. We believe that military law under the Code has come of age and the time has come when the use of the Manual by the court-martial must end.

What we have said up to this point has concerned only trials by general court-martial. We fully appreciate the fact that differences exist between general and special courts-martial, but we cannot accept the whole of the argument that, under no circumstances, can special court members be divorced from reliance upon the Manual, supra, during trial, if they are to carry out their responsibilities. From the standpoint of the president of the special court, we readily acknowledge that he can use— and even needs—the Manual. He performs in the image of the law officer; he is the judge of the special court-martial. As the judge, he is certainly entitled to consult legal sources to assist him in conducting the trial. We recognize that for purposes of instructing on maximum sentence, he must of necessity consult the Manual. Granting the special nature of the president's position, does that mean that the other members of a special court must also have the Manual at all times in order to properly perform their functions?

Article 51(b) of the Code, supra, 10 USC § 851, gives special court members the right to object to the rulings made by the president. As a result, the question is asked: How can the special court members intelligently object if they do not know what the law is? Everyday experience and common sense provide the answer. We have already noted that court members are not presumed to be learned in the law. The legal education of a court does not begin when the court is convened and the members sworn. A court member does not learn the complexities of the hearsay rule or the basis for the impeachment of a witness by thumbing through the Manual during the trial, while testimony is being offered or arguments are being made. We are convinced that court members do not object to legal rulings by the president because of a casual perusal of the Manual. If there is to be an informed objection on a legal, as distinguished from a factual issue, it must result instead from prior knowl-

**408**

edge of military law—which may have been gained through orientation courses as provided for by paragraph 38 of the Manual[6]—or by previous experience as a court member.[7] See United States v Fisher, 8 USCMA 396, 24 CMR 206. The plea therefore that a special court member needs the Manual at all times during the trial ignores the plain facts of day-to-day experience. Regardless of the extent of legal knowledge of the court members, an accused is entitled to know what law is being applied. Sometimes mistakes are made. See United States v Berry, 6 USCMA 609, 20 CMR 325. When they are made, they should appear in the record so that they can be corrected on appellate review.

Mention is made of the fact that in civilian practice a trial judge is permitted to consult various sources of information in order to arrive at an appropriate sentence. From this circumstance it is argued that the court members should be allowed to consult at least the Manual in fixing an appropriate sentence. The argument finds expression in the dissenting opinion in the statement that "The source of the law governing his actions on sentence is not hidden from a judge. It is not error for him to look to the statutes for assistance." Of course it is not improper for a trial judge to inform himself of the sentence limitations set forth in a particular statute; however, we know of no jurisdiction, Federal or state, nor has any been called to our attention, in which a chief executive sets forth policies to be considered by a trial judge in arriving at a sentence as to a particular accused or as to a particular offense. Were it otherwise, a serious question regarding the basic concept of separation of powers between the executive and the judiciary might arise. See Alton v Alton, 207 F2d 667 (CA 3d Cir) (1953), dismissed as moot, 347 US 610, 74 S Ct 736, 98 L ed 987.

Congress gave the President the right to fix the maximum punishment for offenses under the Uniform Code, but we do not believe that Congress intended the President to sit with the court members when they adjudge a sentence in a given case. As a matter of fact, the President himself clearly did not expect to be brought into every trial. He expressly provided that the rules of evidence normally applicable to findings are also applicable to sentence, except as they may be relaxed to a limited extent by the law officer or the president of the special court. Paragraph 75c(1), Manual, supra. See also United States v Strand, 6 USCMA 297, 20 CMR 13.

In molding military practice by way of adjudication, it is within the province of a court, in the words of Mr. Justice Cardozo in Great Northern Ry Co v Sunburst Oil and Refining Co, 287 US 358, 53 S Ct 145, 77 L ed 360, to "make a choice for itself between the principle of forward operation and that of relation backward." We elect the former and choose to give the precedent here established prospective effect. See Mr. Justice Frankfurter's concurring opinion in Griffin v Illinois, 351 US 12, 76 S Ct 585, 100 L ed 891. In so doing we reserve for ourselves, in cases presently pending before us as well as in those which reach us in the near future, the privilege of applying the principles here announced "whenever injustice or hardship will thereby be averted." Great Northern Ry Co v Sunburst Oil and Refining Co., supra.

---

[6] "38. INSTRUCTING PERSONNEL OF COURT.—A convening authority may, through his staff judge advocate or legal officer or otherwise, give general instruction to the personnel of a court-martial which he has appointed, preferably before any cases have been referred to the court for trial. When a staff judge advocate or legal officer is present with the command such instruction should be given through that officer. *Such instruction* *may relate to the rules of evidence, burden of proof, and presumption of innocence, . . ."* [Emphasis supplied.]

[7] Paragraph 4d, Manual, supra, advises a convening authority that in selecting court-martial members, consideration be given to those who are in his opinion "best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament."

We have the utmost confidence that the men and women of our armed forces, who will have the privilege of serving upon courts-martial will perform their duties in the future—without reliance upon the Manual—with the same high standard of fidelity and competence that they have so well demonstrated in the past.

In order that sufficient time be afforded The Judge Advocates General of the respective services to acquaint those responsible for the supervision of military justice with the views expressed in this opinion, we hereby direct that the practice of using the Manual by members of a general court-martial or special court-martial (except the president) during the course of the trial or while deliberating on findings and sentence be completely discontinued on a date no later than thirty days after the promulgation of the mandate in this case.

The decision of the board of review is reversed. The accused's plea of guilty to all specifications and charges precludes error as to the findings. However, as to the sentence, error is present. The record is returned to the General Counsel of the Department of the Treasury for return to the convening authority for a rehearing on the sentence.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

In a number of previous cases I have expressed my belief that, within certain limits, courts-martial could be informed of policy declarations promulgated by the Secretaries of the Services and field commanders. A repetition of my reasons for so concluding is unnecessary in this instance. However, the case at bar involves a different principle, and I believe it worthwhile to record the basis for my dissent. Here we are dealing with the authority of the President to promulgate regulations governing the imposition of punitive discharges and the right of the court-martial to be informed of his policy. The principle that the President has the power to

410

legislate in the sentence field has been long established and it was reaffirmed in the Uniform Code of Military Justice. His declarations furnish valuable aids in equalizing sentences and I find no justifiable reason to hide them from the court-martial. On the contrary, I believe that for us to be consonant with the Code and with the purposes of Congress in redrafting the Articles of War, we must leave his general policy declarations available to those who fix sentences.

A reference to the punitive Articles of the Code will establish that the punishment for only one offense, namely spying, is fixed by Congress. For the crime of premeditated or felony murder, the law gives the court-martial the choice of imposing either a death sentence or life imprisonment. Those are the only areas in which Congress has sought to obtain any degree of uniformity by legislation. There are nine other offenses which, under certain circumstances, carry the maximum penalty of death, but they can be considered in the same category with other crimes for the respective Articles proscribing the crimes, with the two above-mentioned exceptions, permit the sentence to be fixed as a court-martial may direct. However, the court is not unfettered in the exercise of its discretion as Congress has cast the President in an all-important role. Article 56 of the Code, 10 USC § 856, provides:

"The punishment which a court-martial may direct for an offense may not exceed such limits as the President may prescribe for that offense."

That grant of power gives to the President almost unlimited authority in prescribing the limits of the punishment. He has been given the power to operate in the sentence field and his occupancy should not be hedged in by unreasonable limitations imposed by us. In a strict sense of the word, he cannot set the minimum limit, but he can bring about that result because he may prescribe that no sentence will be imposed. He, therefore, operates from the top of the scale to the bottom and he should have the authority to fill in the interstices. That may be done by fixed lim-

itations or by general guides. The former are presented generally in the Table of Maximum Punishments, while the latter are found in other portions of the Manual for Courts-Martial. When considering the policy field, I doubt that anyone would question the President's authority to state that the imposition of the maximum punishment should be reserved for those cases involving aggravated circumstances. That is a statement which might be interpreted as favorable to a person not committing an aggravated offense, but I do not believe this Court should differentiate between declarations which are favorable or unfavorable to an accused and hold that only those favorable to him may be called to the attention of the court. Certainly, if uniformity is to be hoped for, factors for and against the accused should be weighed.

In the case at bar, we are dealing with the crime of larceny, and for that offense the Code merely provides that punishment shall be as the court-martial may direct. Therefore, the President is unfettered in his determination of what specific penalties may be included in the punishment. He may permit the imposition of a dishonorable or a bad-conduct discharge as punishment for a certain degree of the crime, or he might prohibit their inclusion in any sentence. He has the discretion to authorize confinement for life, regardless of the amount of the property stolen, or he could—as he did—graduate the severity of the sentence according to the value of the property taken. In the present Table of Maximum Punishments, if the property stolen is over $50 in value, he has authorized a court-martial to impose a sentence which may include a dishonorable discharge, five years' confinement, and total forfeitures. But, in addition, he must have concluded that all larcenies were serious offenses for he prescribed that a dishonorable discharge is appropriate, regardless of the value of the property taken. The court-martial is given that much information, but the President goes on further and states in the Manual that, when deliberating on the appropriateness of a punitive discharge, the court should consider that the reten-

tion in the armed forces of thieves reflects upon the good name of the military service and its self-respecting personnel. Having the authority to fix a punitive discharge as part of the punishment for all offenses, surely he can offer the court guidelines to help them reach a proper sentence for a particular crime. In the military community, there are certain punishments which must be imposed for their deterrent effect. The President, in fixing the limits of sentences, considers that as a factor and in those crimes which he believes have a more serious impact on morale or discipline, he suggests to the court that consideration be given to separating the accused from the service. Of course, he cannot direct the court to include a punitive discharge in a given sentence, but he can offer factors which should be considered in determining its appropriateness. Therefore, I would hold that he can set out guidelines as aids to those who must labor in the sentence field and that they necessarily must come to the attention of the court-martial.

The effort of my associates to escape whatever logic or force there may be in my arguments by asserting that:

> "Our insistence that no policy directives of a superior be brought to the attention of court members during trial has nothing whatever to do with the President's power to formulate matters which a convening authority may consider in determining whether or not a charge should be referred to trial. As a matter of fact, the subject matter of paragraph 33h, supra, is applicable to the officer exercising summary court-martial jurisdiction over an accused and has no place at all in the trial."

is abortive. Either they have overlooked or misconstrued paragraph 76 of the Manual which deals with the basis for determining an appropriate sentence. I am sure its provisions have a place in the trial, and I quote a statement found therein which seems at variance with the rationale of my brothers. "To the extent that punishment is discretionary, the sentence should provide a legal, appropriate, and adequate punishment. In this connec-

**411**

tion see 33*h*." The reference in paragraph 76 to 33*h* was deliberate and for a specific purpose, and so, too, was the reference in paragraph 33*h* to paragraph 76. The purpose ought to be obvious for if a policy declaration on sentence has any place in the scheme of military law, it must be known and considered by the officer who selects the court to hear the case and by the court-martial members who impose the sentence. That appears to me to be the reason why the framers of the Manual made cross reference in these paragraphs.

One further matter should be mentioned. If prescribing maximum sentences and promulgating general rules governing the imposition of ingredients of punishment may be classed as command control, it is not the kind of influence Congress intended to proscribe. If that deliberative body can ever be charged with having ratified an executive interpretation of a law, this is one instance where the charge may be leveled, for it has consistently approved the President's power to promulgate rules governing sentences. It should be remembered that Manuals for Courts-Martial which have included Tables of Maximum Punishments, rules governing the imposition of sentences, principles permitting the substitution of equivalent punishments, and a myriad of general policy considerations governing the adequacy of sentence, have been published at frequent intervals since 1890. The right of the President to legislate in the sentence field was granted by Congress in that year, and its continuation must have been well known to every legislator who has participated in the various Congressional changes since that time. Significantly enough, even though the Congress went a long way in removing military courts from the influence of miltary commanders when it enacted the Uniform Code of Military Justice, it did not restrict the President in the sentence field, and that indicates to me a Congressional intent as late as 1950 to leave that area of military law under his direction.

The purpose of centralizing authority in the Chief Executive is discussed by Colonel Winthrop in his Military Law and Precedents, 2d ed, 1920 Reprint. The author, on page 395, has this to say about the reasons for enactment of the law:

"The wide discretion here conferred extends not only to all punishments authorized by military law and usage but also to the imposing of different punishments in the same sentence. For a long period also no *maximum* limit was prescribed, and —except in Art. 58, where it is declared that the punishment shall not be less than that provided for the like offence by the law of the State, etc. —no *minimum*. At length, by an Act of Congress of September 27, 1890, enacted for the purpose of inducing something like uniformity in the penalties adjudged by courts-martial in similar cases, it was provided that whenever by the Articles of war the sentence is left to the discretion of the court, '*the punishment shall not, in time of peace, be in excess of a limit which the President may prescribe.*' Accordingly, a code of maximum punishments was prescribed by the President under this Act, *for cases of enlisted men,* which was published in G. O. 21 of February 27, 1891, since amended by G. O. 16 of 1895. This code must be carefully considered by courts-martial in imposing sentence in such cases. The statute of 1890 and the Order prescribing the limits of punishments are set forth in the Appendix."

No one would dispute the fact that Congress has been concerned about the inequities—both intra- and interservice—in punishment, and one of the best methods of obtaining uniformity is for the President to publish general policy considerations as guides for them to use. Obviously, those considerations are of no value unless the court-martial is informed of their content. Certainly when every law which has been enacted since 1890 and every Manual published since that time has not disapproved of the long-established precedent, I find no good reason for us to interfere with it under the mistaken belief that the President is an interloper in the sentencing of an accused. Quite to the contrary, his directions are present in every de-

412

liberation for, by his limitations, he controls effectively the sentence which may be imposed. Certainly Congress could provide in the Code that designated policy matters should be considered by the court in assessing sentence. In lieu of that, it delegated to the President the right to legislate in that area; he has done so, and his declarations should be usable unless they are unjust or unreasonable.

Perhaps a few words on the reasonableness of the provision presently in issue would be appropriate. I can call on some 167 years of history to establish that most persons familiar with military law, the members of several Congresses, and twelve Presidents have tacitly agreed with the principle that retention of thieves in the service is undesirable. Since the first Table of Maximum Punishments was promulgated, the crime of larceny has carried a dishonorable discharge as an appropriate ingredient of the sentence. Even when the amount of property stolen is less than $20—which by any standard ought to be petty thievery—every President has authorized that form of discharge, Congress has not seen fit to consider it inappropriate, civilian Secretaries of Departments have published circulars advocating its consideration, and most servicemen have supported it wholeheartedly. I would gather from these circumstances that those familiar with the control and discipline of the armed services—and I would characterize them as reasonable men—believe that type of crime seriously affects the efficiency, morale, and discipline of the military forces and that the perpetrators ought to be separated. Therefore, regardless of my personal beliefs, it is hard for me to reach the conclusion that the policy is unreasonable. If times and conditions have changed to the extent that the policy is now undesirable, either the President, under his delegation of power, or Congress should make the change.

Now to a discussion about the use of the Manual by court-martial members. In this instance, the Services have been put on notice that hereafter use of the Manual will result in reversal.

Making the ruling prospective will result in some improvement over the confused situation created by our previous decisions. However, I regret having a helpful aid to miltary courts discarded without any good reason to justify its elimination.

As a commencement point on this issue, I call attention to my opinion in United States v Boswell, 8 USCMA 145, 23 CMR 369, where I mentioned the foot-in-the-door method of approaching the question. Here the door is opened wider, and the civilian system is relied on as the wedge. Obviously in that system the use of supporting authorities by a jury is prohibited, but a long-established method of proceeding in military courts which has received sanction in the law and in this Court should not be changed overnight by judicial fiat because it differs from the civilian practice. A Manual is published as an aid to courts-martial members, and it has been used for that purpose ever since the first one was published. The whole military judicial system has been supported by its helpful assistance. Officers in the military services must be both judges and jurors. An officer detailed as a military judge in a summary court proceeding must know and use the Manual. Presidents of special courts cannot operate without references to its provisions. Nonlawyers are appointed to represent accused in the lower courts, and they would fall into error more often than they do at present if they could not familiarize themselves with its contents. If they must learn the provisions for that purpose, we cannot blank their memories when they serve on courts. Members of general courts-martial have authority to overrule law officers on some questions of law, and they must have a working knowledge of the provisions controlling their authority. In addition, all services give their officers some instruction on military law, and that includes familiarization with both the Code and the Manual. Now the net of all of this is that we cannot expect that members of military courts will be unfamiliar with the Manual, even though jurors are not ordinarily learned in the law, and I am not

**413**

in favor of trying to force military law into the exact image of civilian law in this area. When the reasons for a rule differ, the rule differs and in this field the reasons are poles apart.

I believe this case is a good vehicle to illustrate the folly of disregarding all differences between the military and civilian practices. This accused is granted a rehearing on his sentence, and ostensibly the use of the Manual is used as a makeweight to shore up that result. In the sentence field in military courts, the court-martial members become as the judge in the civilian system. They impose the sentence, and they are entitled to know the laws governing its imposition. If we are going to use the civilian system as our pattern, then we should go all the way in that direction. The source of the law governing his actions on sentence is not hidden from a judge. It is not error for him to look to the statutes for assistance. That is the first place I would expect him to search. It is not improper for him in fixing sentence to consider policies important to the preservation of society. He is not required to blind himself to aids in assessing an appropriate sentence. In short, he is given credit for being able to read and interpret statutes, and I am willing to give court-martial members credit for being able to read and apply the Manual provisions. We are indeed forcing members of military courts to operate in darkness in areas where they must rule if we deny them access to the law that should guide them.

There is less reason for a general court-martial to consult the Manual than there is for special courts-martial to use its provisions. It is not to be overlooked that military courts of all types sometimes hold sessions under adverse circumstances. Libraries, textbooks and decided cases are not always available for research, and in time of conflict a Manual is the only source of help to the members. Special courts are not manned by legally trained personnel, and they will operate under almost impossible conditions if the Manual cannot be used as a guide. If an accused cannot obtain a fair trial in a general court-martial without guidance

from a law officer, he surely cannot be afforded one by a special court without help from readily available authorities. Most legislative bodies understand that inferior courts cannot meet the standards of courts of general jurisdiction and more informality is permissible. When Congress set up special courts without requiring the presiding officer to be a lawyer, it must have anticipated that the members could receive assistance on the law and on the regulations governing sentences from some source, and history teaches me that that fountainhead was the Manual. It is my considered judgment that by this decision, we will indeed hurt the trial of cases in the inferior courts, and if they have failed to measure up to our hopes in the past, they will be worse in the future.

There are reforms in military law which are necesary to assure an accused a fair trial, but this one is not essential to that purpose. There are appropriate means of reaching any area where prejudice might possibly be present. In a desertion case, if the court-martial used the Manual and was not informed that the Court had overruled the statement on prolonged absence, it might be presumed that the accused was prejudiced because in that instance the court was possibly furnished with conflicting instructions. But that provision could hardly prejudice an accused who was charged and convicted of robbery. Other illustrations could be multiplied, but they would just prove the point that we should not reverse on appeal without regard to the impact of an error, if any, on the rights of the accused on trial. When we do not individualize cases, we place the Court in the category of the Colonel who reduced all noncommissioned officers in his regiment for the offense of one because in that manner he hoped to deter them all from erring. If the former method of proceeding is inherently so bad as to demand its complete elimination, we should do so forthwith. On the other hand, if by individualized consideration of cases we can avert "injustice or hardship," there is no valid reason why we should not continue to do so, and

414

preserve the system that has long served us well. In this connection, I note that the Court does not feel at all unable to test each case for prejudice until that date after which the use of the Manual is to be forbidden absolutely. I can only conclude, therefore, that by this decision we discard a long-sanctioned—and in my view necessary—method of proceeding, entirely without regard to the supposed vice therein.,

In concluding this opinion, I point up the fact that the Court has attempted to meet some of the arguments I make in support of my dissent. One or two brief remarks in reply will suffice. The last part of the opinion seems to be foreign to the early development. I am first told, "the great majority of court members are untrained in the law. A treatise on the law in the hands of a nonlawyer creates a situation which is fraught with potential harm, especially when one's life and liberty hang in the balance." Then I am informed subsequently:

". . . How can the special court members intelligently object if they do not know what the law is? Everyday experience and common sense provide the answer. We have already noted that court members are not presumed to be learned in the law. The legal education of a court does not begin when the court is convened and the members sworn. A court member does not learn the complexities of the hearsay rule or the basis for the impeachment of a witness by thumbing through the Manual during the trial, while testimony is being offered or arguments are being made. We are convinced that court members do not object to legal rulings by the president because of a casual perusal of the Manual. If there is to be an informed objection on a legal, as distinguished from a factual issue, it must result instead from prior knowledge of military law—which may have been gained through orientation courses as provided for by paragraph 38 of the Manual—or by previous experience as a court member."

The reader may take his choice, but for myself I prefer to have a court member refresh rather than rely on his memory.

Alluding to the majority's comment in another place that they "do not believe that Congress intended the President to sit with the court members when they adjudge a sentence in a given case. . . . the President himself clearly did not expect to be brought into every trial," I am fairly confident that an objective reading of my opinion will not support a belief that I advocate a theory that the President may sit as a member of every court-martial. If that construction is not reached to erect a strawman who can thereafter be knocked down, then obviously I must be charged with advocating a concept that members of Congress and State legislatures may sit in the lap of a judge and control his sentences. The absurdity of both propositions is apparent for all sentences may be controlled by statutes enacted by those with power to legislate and the presence of a book which contains the law can hardly be equated to the presence of strangers who can actively participate in the secret deliberations. True it is that the Governor of a State does not ordinarily prescribe sentencing policies, but military law has grown up otherwise. One of the prime objections to the Court's opinion is the adamant refusal to accept the differences between military and civilian law. To illustrate the point, I might ask, in what civilian system does the Chief Executive prescribe procedure and modes of proof in courts, set the limits of punishment for individual offenses and change them at his pleasure, select the particular jurors to hear a case or extend the statute of limitations? I could use other illustrations to magnify the difference, but I need not do so for we are here concerned with the powers of the President to regulate or legislate in the sentence field. In that area he has reigned supreme during the entire life of our Nation, and I doubt that any serious dispute exists over the constitutionality of the law which clothes him with that authority. Therefore, whether we like the law or not, until it is changed by Congress, it should not be emasculated by us.

I would affirm the decision of the board of review.