UNITED STATES, Appellee

v

JAMES E. DOBBS, Technical Sergeant,
U. S. Air Force, Appellant

11 USCMA 328, 29 CMR 144

No. 13,496

Decided March 18, 1960

*Major Charles K. Rush* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Major Simpson M. Woolf* argued the cause for Appellee, United States. With him on the brief was *Colonel John F. Hannigan.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial, convened in England, convicted the accused of larceny and unauthorized absence for three days, in violation of Articles 121 and 86, respectively, Uniform Code of Military Justice, 10 USC §§ 921, 886. Intermediate appellate authorities affirmed, with some modification of the sentence, which includes confinement at hard labor for twelve months and a bad-conduct discharge. The question before us is whether the accused was prejudiced by use of the Manual for Courts-Martial by the president of the court in the course of the trial.

On October 27, 1958, the accused, a 37-year-old airman with seventeen years of honorable service, was assigned as "Alert" cashier at Royal Air Force Brize Norton base, England. Assignment to this post is for a period of one week, during which the cashier is on 24-hour call. His duty is to convert United States currency into pounds sterling and Military Payment Certificates for personnel arriving at the base, and to change English money and Military Payment Certificates for United States currency for departing personnel. For this purpose the cashier is given a $10,000.00 fund, consisting of $5,000.00 in United States currency and $5,000.00 in Military Payment Certificates, and a .45 caliber pistol. On November 3, the accused did not report for work. A search of the strong boxes in which the cashier's funds were kept disclosed that almost $4,000.00 and the pistol were missing. On November 7, the accused, appearing to be under great emotional strain and "mentally sick," stopped in at a local church and informed the clergyman "what had occurred" during the period of his absence. At the accused's request, the police were called, and the accused was taken into custody. Most of the missing money and the pistol were in his possession.

On the evening of his return to

328

military custody, the accused gave a statement to agents of the Office of Special Investigations in which he accounted for his actions. He said that for about six or seven months he had tried several times to commit suicide; he was greatly disturbed by financial difficulties and a feeling that he had failed as a father and husband. On Sunday afternoon, November 3, he had tried to shoot himself but "was unable to pull the trigger." That evening he decided that if he took enough money and drank enough intoxicants he would "force" himself to take his life. He returned to the finance office, took all the paper sterling (about 14 pounds), some Military Payment Certificates, and an amount of United States currency. He then proceeded to the Noncommissioned Officers Club, where he drank a quantity of vodka. Later he went to London and drank some more, but was unable to take his life. Eventually, after attending several movies, "walk[ing] around thinking," and making several attempts at suicide, which were unsuccessful because he "visualize[d] . . . [his] wife and children," he decided to surrender.

A considerable amount of evidence bearing on the accused's mental state was also introduced at trial. Captain F. L. Clark, Assistant Chief of Neuropsychiatry, 7505th United States Air Force Hospital, testified that in his opinion the accused suffered from an "acute situational reaction" which is classified as a "mental derangement" in which the accused's "over-all functioning" is "grossly impaired". The doctor further testified that if the basic intent of the larceny charge requires "full use of all senses," the accused was not capable of entertaining the specific intent. On the other hand, Dr. M. B. Giffen, Chief of the Psychiatric Service, United States Air Force Hospital, Weisbaden, Germany, testified that he examined the accused and in his opinion the accused's mental state at the time of the alleged offenses was "reasonably normal"; that the accused was suffering from a mere character disorder; that he knew right from wrong; he could adhere to the right; and was capable of forming a specific intent.

At the opening of the trial on January 14, 1959, trial counsel noted for the record that a copy of the Manual for Courts-Martial was "in front of the president," the law officer, and each counsel. A similar statement was made at the beginning of the proceedings when court reconvened on March 4, 1959, after it had recessed for further inquiry into the accused's mental capacity. Before the court closed to deliberate on the findings of guilty on March 4, the law officer directed that "All legal reference material and Manuals for Courts-Martial . . . will be removed from the court during the closed session." After deliberating for some time, the court reopened to request clarification of some of the instructions. On receiving additional instructions, it retired again into closed session; once more it reopened. It requested adjournment to Monday, March 9, at which time it wanted the court reporter "to be able to read" back the accused's testimony. The law officer instructed the court members not to discuss the case during the recess and not to "resort to any outside legal reference material."

Court reconvened on March 9; again trial counsel noted that each counsel, the law officer, and the president of the court had "in front of" him a copy of the Manual for Courts-Martial. The reporter read the defendant's testimony; the court closed for one minute. When it reconvened, the president requested a ten-minute recess. After the recess, the law officer made the following statement:

"LO: Let the record further reflect that the previous closed session lasted for approximately one minute. There was not sufficient time to remove any of the legal authorities from the court. However, the court members did not have access to any of them.

"All Manuals for Courts-Martial and all other legal documents and reference materials will be removed from the courtroom during the next closed session."

The court closed and remained in deliberation for about one-half hour. When it reopened the following comment was made by the law officer:

"LO: Let the record further reflect at this time that there were no legal reference materials or Manuals for Courts-Martial present in the court during the closed session."

After the case came up for review before this Court, the Government filed an affidavit from the president of the court-martial to the effect that "at no time" during the proceedings, did he, to the best of his knowledge, consult the Manual for other than the procedural guide set out in pages 501 to 521, which he was "required to read."

As early as United States v Clark, 1 USCMA 201, 2 CMR 107, we called attention to inaccurate statements in the Manual for Courts-Martial in regard to proper trial practice. Over the years, we noted many other deficiencies in the Manual. Finally, in United States v Rinehart, 8 USCMA 402, 24 CMR 212, we reviewed the dangers to material rights of the accused inherent in the use of the Manual by court members during trial. We directed that "the practice of using the Manual by members of a general court-martial . . . during the course of the trial or while deliberating on findings and sentence be completely discontinued on a date no later than thirty days after the . . . mandate in this case." Our *Rinehart* opinion was published on November 15, 1957, and the mandate issued on November 27, 1957. Our decision did not meet with universal approbation; see, "A Chronicle of Recent Developments in Military Law of Immediate Importance to Army Judge Advocates," JAGS 250 36/57, pages 36/3–36/4; Hoyler, "*Caveat*: The Manual for Courts-Martial," 86, United States Naval Institute Proceedings 58 (1960). However, review of the situation and the cases leaves us convinced of the essential soundness of the decision and of the necessity for forthright adherence to it.

This case was tried more than a year after *Rinehart*. In its brief, the Government does not "suggest" that it regards "with favor" the practice followed in this case, and it concedes that "Situations can be foreseen where results would obtain which *Rinehart* clear-

ly intended to preclude." Indeed, the instant procedure indicates a reluctance to accommodate earlier thinking and earlier practice to the purposes and the spirit of *Rinehart*. To give the president of the court a copy of the Manual seems to stress the desirability of former procedures over the principles set out in the *Rinehart* case. It suggests an erosive process which we cannot sanction.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside. A rehearing may be ordered.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

The interested reader will find my views on this subject set forth in my dissenting opinion in United States v Rinehart, 8 USCMA 402, 24 CMR 212. Since they have been rejected, however, by my associates, there is no utility in re-arguing them here. I do believe it worthwhile, though, to invite attention briefly to other matters.

It is of interest to note that my brothers acknowledge that "The question before us is whether the accused was prejudiced by use of the Manual for Courts-Martial by the president of the court in the course of the trial." I suggest, if that is the question, that the results reached are erroneous, for the majority opinion itself confutes even the most remote suspicion of prejudice to this accused. Here there was no indiscriminate rummaging through a legal treatise and there was no reading of any subject matter which would touch on any issue; rather, the president of the court merely referred to the procedural guide, which he needs to assist him and to the contents of which no hint of impropriety attaches. Defense counsel saw no vice in the procedure, for it was announced in open court on several occasions and he made no objection thereto. Hence it is apparent my associates reverse accused's conviction wholly without regard to any impact of the asserted error upon the fairness of his trial, but solely to punish a Service for a possible deviation from *Rinehart*.

In this connection I point out that that case was decided well over two years ago. I suggest that the rule—notwithstanding my personal disagreement therewith—has become established, and wonder whether, in view of the infrequency with which case records indicate any use of the Manual by court members, it is not time to consider adopting the same approach as was announced in an analogous situation in United States v Allbee, 5 USCMA 448, 18 CMR 72.

While it may involve some element of risk to follow my recommendations, it is not inappropriate to suggest that the Services can obviate recurrence of this problem by a simple expedient. It should be easy to provide the presidents of courts-martial with copies of such portions of the guide for trial procedure set forth in appendix 8a, Manual for Courts-Martial, United States, 1951, as are necessary for their use in open court in administering oaths and otherwise properly performing their duties. Those extracts should be marked and attached to the record as an appellate exhibit, and in that fashion no question will arise as to whether the court-martial has had access to forbidden materials.