UNITED STATES, Appellee

v

JERRY WATKINS, III, Airman Basic, U. S. Air Force, Appellant

22 USCMA 270, 46 CMR 270

No. 26,199

May 18, 1973

*Major Paul K. Lewis, Jr.*, argued the cause for Appellant, Accused. With him on the brief were *Colonel George M. Wilson* and *Captain Robert L. Bridge*.

*Colonel C. F. Bennett* argued the cause for Appellee, United States.

### Opinion of the Court

DARDEN, Chief Judge:

We granted review of this case to consider issues relating to the effect of a questioning of the accused without warning; the regularity of an inventory of his automobile; the voluntariness of his consent to a search of his room; and the effect of court members' being furnished before trial with selected excerpts from the Manual for Courts-Martial.

On December 30, 1971, Technical Sergeant Bole, a security policeman, was patrolling the barracks area at Randolph Air Force Base, Texas. Observing an airman and a woman in circumstances that led him to believe the woman had been in the man's barracks, Sergeant Bole circled the area in his automobile and returned to the parking lot of the barracks. There he noticed the woman standing beside a 1966 Mustang automobile. He checked by radio with his headquarters and found that the license plate on the Mustang had been issued for another car. Bole also observed that the airman had joined the woman at the car and was unlocking the door.

Bole approached the couple. He identified the airman as Sergeant McKellar and asked him if he owned the Mustang. McKellar replied that the automobile belonged to the accused. Bole directed McKellar to send for the accused from the barracks. When he arrived the accused acknowledged his ownership of the Mustang.

Bole also asked the accused for permission to have Sergeant McKellar, accompanied by the woman, drive the Mustang to the security police headquarters. Watkins consented, and Bole requested that he also come down in another patrol car after he had dressed. McKellar and the woman drove off in the Mustang, escorted by Bole in his patrol car. The accused returned to his barracks, dressed, and went to the security police headquarters in a police car.

**22 USCMA 271**

After everybody involved arrived at the police station, Bole advised the accused of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, as well as his right to counsel, and informed him that he was suspected of having illegal license plates on his automobile. The accused indicated that he understood his rights and declined the services of an attorney. He then related that difficulties with the Florida registration of his vehicle led him to procure Texas plates from a friend. Because the car was improperly registered, Sergeant Bole's superior, Sergeant Helton, ordered it impounded until it was properly registered and directed Bole to inventory its contents in the accused's presence, record the contents on an Air Force inventory form, and deliver a copy of the form to the accused.

In the accused's presence, Sergeant Bole searched the automobile, beginning with its glove compartment. There he found some change, a comb, cigarette papers, and a pistol clip. He gave the accused the change and the comb and continued the inventory by looking under the dash and removing the rear seat. Finally, he examined the contents of the trunk and found marihuana wrapped in a newspaper.

In the meantime, Sergeant Helton received a telephone call from the accused's commanding officer, Major Walker, who informed him that marihuana might be found in the accused's car. Helton decided that the inventory should be stopped and a search warrant procured. While on his way to issue these instructions to Sergeant Bole, he met Bole, who informed him that he had discovered marihuana in the trunk of the car. A criminal investigator, Staff Sergeant Goodwin, was contacted and took charge of the case.

Goodwin again advised the accused of his rights and informed him that he was suspected of a drug offense and possible possession of an illegal weapon. He then obtained the accused's written consent to search his room. The consent form advised the

**22 USCMA 272**

accused that he did not have to consent to the search, that no influence would be brought on him to do so, and that any evidence found might be used against him in a trial by court-martial.

The search of the accused's room disclosed cigarette butts containing marihuana and tablets containing lysergic acid diethylamide (LSD).

I

■ The first issue is whether Sergeant Bole should have warned the accused before asking him if he was the owner of the Mustang automobile. Having been previously informed that the car was improperly registered and that the accused was the owner, Bole must have suspected him of an offense, and we assume that the usual threshold advice was required. United States v Henry, 21 USCMA 98, 44 CMR 152 (1971). In this instance, however, the failure to warn was not reversible error.

The accused entered a provident plea of guilty to the charge concerned with the vehicle's registration. He persisted in that plea after the military judge fully explained its meaning and effect. Since the statement was not used in this conviction, we find no basis for reversal. United States v Tharp, 11 USCMA 467, 29 CMR 283 (1960); United States v Trojanowski, 5 USCMA 305, 17 CMR 305 (1954); cf. United States v Hamil, 15 USCMA 110, 35 CMR 82 (1964).

■ Moreover, the accused's apprehension and the inventory of the Mustang that followed were not the fruits of the unwarned statement. Sergeant Bole had already been informed of the car's improper registration and the accused's ownership before questioning Watkins. The automobile was moved to police headquarters with the accused's permission and he was not taken into custody until the inventory turned up the marihuana. Until that discovery, the accused's vehicle was to be impounded because of its improper tags, but the accused himself was free of restraint. This case is distinguishable from United States v Atkins, 22 USCMA

244, 46 CMR 244 (1973), for here no exploitation of the unwarned statement occurred. The impounding of the car came "'by means sufficiently distinguishable to be purged of the primary taint.'" Wong Sun v United States, 371 US 471, 488 (1963).

## II

■The second issue concerns the inventory of the car, whether it was in fact a search and, if so, whether the search was legal. Appellate defense counsel urge us to hold that the alleged inventory in this case was a subterfuge to cover a search of the accused's vehicle without probable cause. See United States v Mossbauer, 20 USCMA 584, 44 CMR 14 (1971). That contention was made at the trial, and the defense emphasized Sergeant Bole's searching under the dash and the rear seat as being inconsistent with a desire to secure and list the accused's personal property on the prescribed Air Force form.

On the other hand, no evidence suggests that the accused was suspected at that time of any offense other than the improper registration of his vehicle. The testimony was also that Bole had never before conducted an inventory and that Sergeant Helton, who had done so, had previously looked under seat cushions. Moreover, Bole earlier discovered a pistol clip in the glove compartment that might reasonably have led him to suspect a weapon was concealed under the dashboard or seat. Finally, on receiving information from Major Walker that marihuana might be concealed in the vehicle, Sergeant Helton immediately attempted to stop the inventory process.

Considering these circumstances, the military judge could reasonably reject the defense contention and find, as he did, that Sergeant Bole's actions constituted a lawful examination to inventory the contents of the car. United States v Kazmierczak, 16 USCMA 594, 37 CMR 214 (1967).

## III

The third issue relates to the voluntariness of the accused's consent to the search of his room and, assuming no such consent was given, whether probable cause existed for the search.

As noted above, Sergeant Goodwin testified that the accused, after being fully advised of his rights, consented in writing to the search of his room. The accused admitted that he signed the consent form but claimed that he did so only after being told by Goodwin that if he did not consent, the base commander's permission would be obtained and the room searched anyway.

■ The Government must prove by clear and convincing evidence that consent to search an accused's effects was freely and voluntarily given. United States v Rushing, 17 USCMA 298, 38 CMR 96 (1967); United States v Herberg, 15 USCMA 247, 35 CMR 219 (1965); United States v Wilcher, 4 USCMA 215, 15 CMR 215 (1954). In this case the Government's evidence meets that standard. The accused was not taken into custody until after the marihuana was discovered in his car. More than once he was advised of his rights under Article 31 and offered the services of counsel. He was informed that he did not have to consent to the search and that any evidence discovered in his room might be used against him. Although he asserted that Goodwin informed him that failure to grant consent would lead to application to the base commander for authority to search the room, the conflict between his testimony and that of Goodwin presented only a question of fact for resolution by the military judge. Cf. United States v Alaniz, 9 USCMA 533, 26 CMR 313 (1958). Since substantial evidence supports his decision, we will not disturb it. United States v Insani, 10 USCMA 519, 28 CMR 85 (1959).

■ When, as here, consent to search is established, the ordinary requirement that probable cause exists is dispensed with. The protection of the Fourth Amendment "reflects a dual purpose—protection of the privacy of the individual, his right to be left alone; protection of the individual against compulsory production of evidence to be used against him." Davis v United States, 328 US 582, 587 (1946).

**22 USCMA 273**

Neither of these purposes is defeated when a search follows voluntary consent of the person affected. Should such a person desire to protect his privacy or to prevent production of evidence against him, he need only withhold his permission from those seeking to search. We have had cited no authority for the proposition that probable cause is required for consensual searches, and we know of no foundation for the imposition of this additional requirement. See paragraph 152, Manual for Courts-Martial, United States, 1969 (Rev ed); Maxwell v Stephens, 348 F2d 325 (8th Cir 1965), *cert denied*, 382 US 944 (1965).

## IV

The final issue involves the effect of furnishing court members before trial with a folder containing several excerpts from the Manual for Courts-Martial..

During voir dire, the court members disclosed that the staff judge advocate, Colonel Del Beccaro, had furnished each of them with a binder containing excerpts from the Manual for Courts-Martial "for information purposes." The excerpts included information relating to the classification and composition of courts-martial, convening of courts-martial, personnel of courts-martial, oaths, incidental matters, punishments, the Table of Maximum Punishments, rules of evidence, trial procedure guide, and the Table of Commonly Included Offenses, extracted from chapters 2, 8, 9, 22, 23, 25, and 27, and appendixes 8 and 12 of the Manual. The binder's preface indicated that it was intended to familiarize the members with their duties but was not to be taken into the courtroom "nor referred to at any time during any trial."

Defense counsel objected to the inclusion in the binder of the Table of Maximum Punishments and the Table of Commonly Included Offenses. The military judge denied a challenge for cause of the entire court and ascertained that the members had no recollection of the punishments for the of-

**22 USCMA 274**

fenses charged. He instructed the members that they were to take their law solely from his instructions and that they were not to examine the binders during the trial. He also established that all members were willing to abide by his instructions.

This Court long ago held that the members of a general or special court-martial could not refer to the Manual for Courts-Martial during the course of a trial or their deliberations. United States v Rinehart, 8 USCMA 402, 24 CMR 212 (1957). The only source of instructions to the members is the military judge, because "[a] treatise on the law in the hands of a nonlawyer creates a situation which is fraught with potential harm, especially when one's life and liberty hang in the balance." Id. at 407, 24 CMR at 217.

The Court reiterated its injunction in United States v Kentner, 12 USCMA 667, 669, 31 CMR 253, 255 (1962), Judge Kilday pointing out, "Law books unnecessarily in the hands of laymen may be as dangerous to the proper administration of justice as scalpels in the hands of laymen may be to the success of major surgery."

We see little distinction between permitting court members to read the Manual for Courts-Martial while the trial is in progress and furnishing them with excerpts from its provisions before trial. Congress made the military judge the source of law for the court members and largely restricted the members' function to that of fact-finding jurors. As such, they require no knowledge of the Manual or extracts from it. Particularly they must take their instructions on the lesser included offenses and sentence from the judge, and his rulings govern on evidence questions. Consequently furnishing Manual excerpts to potential court members on topics the military judge would instruct them on was error. Such an error tends to lessen the judge's authority in the eyes of the court and to mislead the members into going beyond his instructions and rulings in determining the guilt or innocence and

punishment of the accused. The practice should not be repeated.

But to say that furnishing the binders to the court members was error is not to conclude that reversal must occur. An attempted orientation of the members before trial is to be measured by its prejudicial effect, as disclosed by their voir dire, rather than by a challenge to the array. United States v Gordon, 253 F2d 177 (7th Cir 1958). In that case, as here, the defense made no effort to determine if reading a controversial jurors' handbook had any impact on the individual juror's ability to accord the accused a fair trial. The court refused to presume the existence of prejudice. In the present case, we have an even more sound basis for determining that prejudice did not flow from the error. Although defense counsel did not question the members, the military judge elicited that they had no recollection of the parts of the binder of which counsel complained and that they believed themselves bound to look to the judge as their only source of the law. His examination established that they were not influenced by their improper orientation. Consequently, the error was not prejudicial. United States v Davis, 12 USCMA 576, 31 CMR 162 (1961).

The decision of the United States Air Force Court of Military Review is affirmed.

Judge QUINN concurs.

DUNCAN, Judge (dissenting):

There are some errors which are, by their very nature, prejudicial *per se*. Where such an error is involved, reversal follows without reference to the possible presence of harm. See United States v Woods, 2 USCMA 203, 8 CMR 3 (1953).[1] In my opinion, an error of that magnitude occurred in this case when the staff judge advocate furnished each of the court members

with a binder containing excerpts from the Manual for Courts-Martial. The Court was appointed on February 3, 1972, and the material was furnished to them on the following day.[2] The binder contained, among other material, copies of Manual pages relating to the "Rules of Evidence." Each of the members acknowledged that he had read it. The letter of transmittal also contained the following:

We believe this guide may encourage you to go to the Manual itself for further information on your duties and responsibilities.

As this Court stated in United States v Rinehart, 8 USCMA 402, 407, 24 CMR 212, 217 (1957):

We have absolutely no way of knowing whether a court-martial applied the law instructed upon by the law officer [predecessor of the military judge] or whether it rejected such instructions in favor of other material contained in the Manual.

The procedure in this case is far different and easily distinguishable from the military law lecture given prospective court members in United States v Davis, 12 USCMA 576, 31 CMR 162 (1961), on which the Chief Judge relies for his finding of no prejudice. While a majority of this Court in *Davis* found no evidence of command influence inherent in the material contained in the lecture, it was specifically noted that "pretrial lectures or conferences should be carefully limited to general orientation on the operation of court-martial procedures and the responsibilities of court members." 12 USCMA at 581, 31 CMR at 167. See also United States v Danzine, 12 USCMA 350, 30 CMR 350 (1961). I have no doubt that had the lectures in *Davis* and *Danzine* contained any reference to the rules of evidence, reversal would have un-

---

[1] For an extended discussion of the doctrine of general prejudice see the separate concurring opinion of Judge Brosman in United States v Woods, supra.

[2] Trial was held February 23–25, 1972.

hesitatingly followed. Cf. United States v Wright, 17 USCMA 110, 112, 37 CMR 374, 376 (1967).

The Manual is a book of law, Article 36, UCMJ; United States v Smith, 13 USCMA 105, 32 CMR 105 (1962), and, as this Court stated in United States v Kentner, 12 USCMA 667, 669, 31 CMR 253, 255 (1962):

Law books unnecessarily in the hands of laymen may be as dangerous to the proper administration of justice as scalpels in the hands of laymen may be to the success of major surgery.

On these grounds, I would reverse the findings and sentence of the Court-martial, and authorize a rehearing.