UNITED STATES, Appellee

v

WILSON H. SHEPHERD, Captain, U. S. Army, Appellant

9 USCMA 90, 25 CMR 352

No. 9875

Decided April 4, 1958

*Major Frank C. Stetson* argued the cause for Appellant, Accused. With him on the brief was *Frank D. Reeves, Esquire.*

*Major Thomas J. Nichols* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel John G. Lee* and *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

Major General Thomas M. Watlington, Commanding General of the 8th Infantry Division, Fort Carson, Colorado, promulgated an order requiring overweight personnel of his command to reduce by diet and exercise. The accused, a six-foot three-inch officer, was one of those who came under the provisions of the "fat boy" program. In February 1956, he weighed in on a dispensary scale at three hundred pounds. On the basis of plotting charts prepared by the medical staff, he was required to lose one hundred pounds.[1]

During March and April the accused reported to the dispensary for weighing and also submitted weight reports. In May he furnished reports as to his weight on the basis of readings on his bathroom scales. On June 28th, the accused had Master Sergeant Kuka pre-

pare a report to the effect that he weighed two hundred and forty-five pounds. The next day, however, his weight was recorded on the dispensary scale as two hundred and eighty-four pounds. As a result, the accused was charged with making a false official statement, in violation of Article 107, Uniform Code of Military Justice, 10 USC § 907 and with conduct unbecoming an officer, in violation of Article 133, Uniform Code of Military Justice, 10 USC § 933, in that he wrongfully directed Master Sergeant Kuka to prepare a false official report.

A general court-martial found the accused guilty as charged and sentenced him to dismissal and total forfeitures. Intermediate appellate authorities affirmed, but the board of review reduced the sentence to a forfeiture of $200 per month for six months. The accused ap-

---

[1] A second dispensary chart shows the accused as weighing two hundred and ninety pounds at the initial weighing in.

92

pealed to this Court and we granted review on several assignments of error.

Originally, the accused was also charged with failing to obey an order. In connection with that charge the parties took the oral deposition of Major J. T. Robinson, who purportedly issued the order. Defense counsel conducted an extensive cross-examination of the witness on the nature of the purported order. Later the charge was dropped, and the other charges were changed to those upon which the accused was brought to trial. At the trial, the prosecution offered Major Robinson's deposition. Defense counsel objected to the admission of the cross-examination portion of the deposition because it related to an offense not in issue, and was irrelevant to the present charges. The law officer indicated that he was inclined to "rule favorably for the defense" and that he would instruct the court members to disregard the cross-examination as "irrelevant." Defense counsel insisted that the objectionable matter should be kept entirely from the court-martial. However, his objection was overruled. The entire deposition was admitted in evidence with the following cautionary instruction:

> "LO: Gentlemen, I have admitted Prosecution Exhibit 3 in total so that you could understand its connection with the specifications and charges before you now. The reference in the deposition as to other offenses should be totally disregarded by the court. Proceed."

Major Robinson's testimony is to the effect that he received a report on June 25, 1956, regarding the accused's weight. As a result, he telephoned the accused and "advised him that the Colonel would not be satisfied with the report or something to that extent" because it showed his weight as of an earlier date. He "requested" the accused to get weighed, and was informed that a new report would be submitted. A few days later the Major had still not received the supplementary report. He communicated with Lieutenant Smith to have him "contact" the accused "to get the report in." On cross-examination the witness was searchingly examined on whether the "request" was a "direct order." At one point he testified as follows: "I don't think there is any difference between . . . an order and a request, as far as that's concerned. I told him to go over and get weighed. If you want to consider it an order, a direct order or a request, I don't think it makes any difference." He also admitted that he testified at the Article 32 investigation (not the one in connection with the instant charges) that he "didn't feel that the relationship between Captain Shepherd and I was such that I had to give him a direct order."

The Government contends that Major Robinson's testimony shows the officiality of the alleged report. However, the conversation between the witness and the accused was not the generating force of the weight-reducing program. On the contrary, it had its origin in the program. Be that as it may, the deposition testimony was clearly divisible. In the direct examination the witness described his statement to the accused as a request. The general tenor of the conversation appeared to be a reminder to the accused of his obligations under the weight program. On cross-examination, however, the witness forcibly maintained that in his opinion he had given the accused an order. This testimony might have relevance in a prosecution for violation of the order (United States v Mitchell, 6 USCMA 579, 20 CMR 295), but it shed no light on the truth or falsity of the weight report subsequently submitted by the accused. The law officer therefore was correct in concluding that the cross-examination was "irrelevant." In essence, it charged the accused with an offense which had been the subject of a formal Article 32 investigation. Except in limited circumstances, evidence of facts of misconduct by an accused other than those charged should not be brought to the court's attention. It was error to admit into evidence the cross-examination part of the deposition testimony. Error being present, the question is whether the error prejudiced the accused. We will discuss this aspect of the problem later in the opinion.

The second assigned error concerns the law officer's ruling on a defense ob-

jection to certain cross-examination of the accused by trial counsel. The accused took the stand to testify on his own behalf. In substance, his direct testimony amounts to a claim of honest mistake in his reports, which resulted from an incorrect initial weight record at the dispensary, because the scale did not go over three hundred pounds, and subsequent readings from his own inaccurate bathroom scale. Trial counsel questioned the accused in detail on the discrepancies in his reports. In the middle of his examination he suddenly shifted to another line of attack. The transition and the nature of the attack appear in the following excerpt from the record:

"Q: Didn't you submit these reports because you didn't want battalion headquarters to know your true weight?

"A: There would be no advantage to that as it is necessary to get a certificate of completion of the course from the medics before you can get off the program.

"Q: You weren't trying to hide your true weight and the fact that you were not reducing according to the prescribed rate?

"A: No. I wouldn't say that.

"Q: Captain Shepherd, have you ever misappropriated Government parts and had them used in your own private automobile, without paying for them?

"DC: I object, that is not an offense charged here.

"TC: Sir, I am prepared to put questions to the witness and if he denys them, to show that there was an offense involving moral turpitude and it is permissible to impeach the witness.

. . . . .

"Q: Have you ever directed any of your subordinates to take the motor from your car, or your car down to the Division Maintenance Shop and use Government parts in your motor without paying for them?

"A: Of course not.

"Q: You have not?

"A: Positively not.

"Q: This did not happen about the 1st of June?

"A: I deny that it happened any time."

After some repetition of the questions and answers regarding the illegal appropriation of Government property, trial counsel returned to his questioning on the validity of the accused's weight reports. Following the luncheon recess and several "recross-examinations," trial counsel again injected references to the accused's appropriation of Government materials. His examination is as follows:

"Q: Did you ever have anybody from the Division Ordnance Shop work on a starting motor for your car during duty hours for which they were not paid, and at which time they used Government parts?

"A: I had a Bendix spring installed by my company clerk, but no Government parts were used.

"Q: Did you pay the man who worked on it during army time?

"A: I don't believe he worked on it during army time.

"Q: Do you know if he worked on it during army time?

"A: No.

"TC: No further questions."

No evidence of actual misconduct was presented. In his final instructions the law officer recalled to the court-martial "that the prosecution insinuated by questions" that the accused was guilty of appropriating Government property. He advised it that there was no evidence of such an offense and he directed the court to "totally disregard the inference to be drawn" from the prosecution's questions since "it was unfair to the accused and it is illegal for you to draw such an inference."

An accused who takes the stand to testify, is like any other witness, subject to impeachment by evidence that he previously committed a crime affecting his credibility. In the absence of a conviction the evidence of misconduct can be adduced only by cross-examination. Manual for Courts-Martial, United States, 1951, paragraph 153b; United State v Berthiaume, 5 USCMA 669, 18 CMR 293; see also United States v

Roark, 8 USCMA 279, 24 CMR 89. Since the accused was apparently not convicted of the purported appropriation of automotive parts, or for misuse of his subordinates, Government appellate counsel contend that trial counsel had no other way but that which he followed to inquire into the matter. On the facts in this case the argument is wide of the mark.

Military law allows a wider scope of cross-examination as to other offenses than is permitted in many civilian courts. United States v Roark, supra. The possibility of abuse of the more liberal rule emphasizes counsel's responsibility scrupulously to avoid "innuendoes and insinuations" (United States v Long, 2 USCMA 60, 6 CMR 60), and to predicate his questioning upon the possession of facts which support a genuine conviction that the witness had committed an act involving moral turpitude or affecting his credibility. Counsel must also realize that he is bound by the witness' denial of wrongdoing, unless he has evidence of an admissibile conviction. United States v Russell, 3 USCMA 696, 14 CMR 114. Here, trial counsel was unaware of, or deliberately disregarded, these strict limitations on his right to impeach the accused. When objection was made to his initial question, it was improper for him to declare before the court members that, if the accused denied the crime, he would "show that there was an offense." It was also error for him deliberately to go into the matter again after explicit denials by the accused. In our opinion his erroneous actions improperly depicted the accused as "a despicable character" unworthy of belief by the court-martial. United States v Warren, 6 USCMA 419, 429, 20 CMR 135.

Instructions by the law officer to the court-martial to disregard inadmissible evidence and erroneous actions by counsel may, in some situations, effectively eliminate the possibility of prejudice to the accused. United States v Shaughnessey, 8 USCMA 416, 24 CMR 226; United States v Russell, supra. Under other circumstances, a cautionary instruction is insufficient to overcome the adverse impact of the evidence upon the court members. See United States v Patrick, 8 USCMA 212, 24 CMR 22; United States v Warren, supra) page 429. There is no hard and fast rule in any particular case, but the general rule is that an accused must be accorded a fair trial. United States v Richard, 7 USCMA 46, 50, 21 CMR 172. In this case there is not only improper conduct by trial counsel, but also inadmissible evidence that the accused disobeyed the order of a superior officer. The accused's defense hinged upon whether the court-martial believed his representation that he acted in good faith in preparing the weight reports. Considering a substantially similar situation in the *Warren* case, supra, page 429, we said: "We are sure that when he [the accused] was tarred with the possible commission of two despicable crimes, his credibility was impaired, the Government's case was strengthened, and his defense was weakened appreciably." Cf. United States v Nicholson, 8 USCMA 499, 25 CMR 3.

Other assignments of error relate to the question of command control. As it is unlikely that this issue will arise on a retrial of the case, we need not consider it. The remaining allegations of error turn, to some extent, upon the evidence. Since these issues may be fully inquired into upon a rehearing, it is unnecessary to discuss them further.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside. A rehearing may be ordered.

FERGUSON, Judge (concurring):

I concur fully in the principal opinion as well as with the views expressed in the separate concurrence.

LATIMER, Judge (concurring in the result):

I concur in the result.

It is not necessary for me to express an opinion on the rationale of the majority opinion for I prefer to base my concurrence upon a much more fundamental issue. In this instance, I find a trial and procedural climate which

was so permeated with the potentialities for prejudice to one accused of any act which savored of resistance to a program initiated by the convening authority, that I believe a reversal is required.

The offenses of which the accused stands convicted arose as an incident to a weight-reducing project initiated by General Thomas Watlington, Commanding General, Eighth Infantry Division, Fort Carson, Colorado. It was during January 1956 that General Watlington announced the program which had as its purpose the reduction in weight of obese officers and men in order to shape up his Division as a more effective fighting force. In February, he ordered all overweight persons to be examined by a doctor who would prescribe a schedule for the loss of weight. As the plan progressed, personnel who lagged in meeting the requirements began to find themselves punished under Article 15, separated by administrative discharges, or hailed before courts-martial. Figuratively speaking, the plan was not only "the talk of the town," it was the military death knell for those who fell by the wayside. It was the brain child of the convening authority in this case and I have no doubt but that he had more than an official interest in its success.

Unfortunately the issue was not raised at trial and I am immediately confronted with the legal question of what I may properly consider to support the conclusions I reach. Generally speaking, I have frowned upon the raising of issues at appellate levels when they should have been decided prior to trial and I still do. But the rule is not one of rigidity and this case offers a peculiar situation in that all court-martial personnel were inculcated with the doctrine that their commander had an objective which they must help him reach. However, I need not pursue that thought further, for on a number of occasions a majority of the Court has taken a position opposite to my concepts and in United States v Ferguson, 5 USCMA 68, 17 CMR 68, it was specifically held that pretrial influence by a commander could be raised for the first

96

time on appeal. Therefore, that case offers precedent for reaching the present issue.

With that as a beginning, I am still faced with the problem of what evidence I can consider to shed light on the question of influence in this instance. Perhaps it is necessary for me to break the heap of facts into two bundles. One is composed of evidence in the record and contents of official documents which were published by the Army. The second consists of printed articles widely circulated which, in fairness to the Government, would not be used to support a position that the convening authority was an accuser had they not been tacitly accepted as true by the parties. However, I am certain that because they were mentioned and argued before the board of review and this Court without question, the Army could not and would not care to dispute them.

Principally I rely on official records as the base to substantiate my position because the Government does not question their authenticity and in its brief concedes their validity. In that setting, the recitations of The Judge Advocate General's letter and the Department of the Army policy letter, hereinafter referred to, are matter which could properly be judicially noticed. Those documents of themselves are sufficient to support an inference that the plan was personally conceived, carefully nurtured, strictly enforced, and ruthlessly administered by the convening authority.

I do not evaluate the information published in a national magazine but I mention it as supporting evidence which shows the notoriety of the program and the probability that the General had a very intimate relationship with his overenthusiastic venture. Accordingly, when the facts from all sources are consolidated, pictures emerge clearly of a personalized undertaking by the convening authority and trial obstacles by the court-martial.

I first quote the Department of the Army message number 448708, dated August 22, 1956, which was dispatched to all major commands:

"Recent newspaper articles con-

cerning the trial of individuals at Fort Carson, Colorado for excess weight introduce a legal question into the problem of failure to lose weight.

"The Judge Advocate General has ruled that it is appropriate to order an overweight person to report to a medical officer with a view to entering upon a prescribed weight reduction program and to bring him to trial for refusal or failure to report. If an overweight person reports as ordered but objects to entering upon a prescribed program, action under par 24, AR 600–10 with a view toward punitive action is appropriate. The Judge Advocate General has further ruled that it is illegal to take disciplinary action simply because an individual has failed to lose weight."

From that message I deduce that there had been considerable publicity about the trial of individuals who were not wholeheartedly helping the General reach his goal. That message was dated August 21, 1956, and this accused was convicted six days prior to that time. The short time lag between the publications and action by The Judge Advocate General would strongly suggest that the newspaper accounts had made this unique venture a cause celebre before this trial was held. But the General was not to be deterred and according to his published views, all violators had to be punished.

The next official document of importance is a letter of the Military Justice Division, Office of The Judge Advocate General, which states:

"*Problem:* In January, 1956, the Commanding General, Fort Carson, Colorado, announced a policy whereby all overweight military personnel were to reduce. In February, he ordered all overweight persons to be examined by a doctor who would prescribe rates for the loss of weight. Calorie charts to be followed were provided for each man. In May and June, punitive action was initiated against persons who failed to reduce at the prescribed rate. Current statistics indicate that fifty individuals had been punished under Article 15, Uniform Code of Military Justice; six

persons had been eliminated by board proceedings; one officer had been convicted by general court-martial of making false official statements regarding his weight; and fourteen enlisted persons had been tried by special or summary court-martial. In the latter group, two were found not guilty, four were convicted with the convictions being upheld upon appellate review, and eight were convicted with the convictions being set aside because of insufficient evidence. Charges under which these individuals had been tried were: Failure to obey a lawful order; to wit, failure to report to a medical installation as directed, and failure to lose weight at a specified rate. On 22 August 1956, a message to all commands was dispatched setting forth the views of The Judge Advocate General contained in the Conclusion, *infra*. As a consequence of this message, the Commanding General, Fifth Army, directed that no further punitive action with respect to the weight reduction program be taken at Fort Carson. He also instituted a review of those actions previously taken.

"*Comment:* An order must relate to military duty and be one which the superior officer is authorized under the circumstances to issue to the accused. A person cannot be convicted if the order was illegal, but an order is presumed to be lawful and is disobeyed at the peril of the subordinate.

"*Conclusion:* It is appropriate to order an overweight person to report to a medical officer with a view to entering upon a weight reduction program and to bring him to trial for refusal or failure to report. If an overweight person reports as ordered, but objects to entering upon a prescribed program, action under paragraph 24, Army Regulations 600–10 (Refusal of medical treatment) with a view toward punitive action is appropriate. This regulation requires medical board action and review thereof by the Surgeon General before court-martial action is instituted or discharge or retirement initiated. However, it is illegal to take disciplinary action simply because an in-

dividual has failed to lose weight." [JAGJ 1956/7014, September 7, 1956.]

The foregoing document was published less than three weeks after this accused was convicted and about one week subsequent to the time the convening authority acted on the findings and sentence. At the time of the latter's action, seventy-one members of the command had been punished and by this time it was painfully apparent that throughout this entire program the General would brook no interference with the purposes he intended to accomplish. If the civilian publications do not depict him as an officer who was conducting a remedial enterprise with a vengence, these prosecutions do.

In spite of the storm flags posted by the communications from The Judge Advocate General of the Army, which ought to have been sufficient to discourage a commander supporting an official experiment, the General was so personally interested in his cause that he refused to yield. For example, Life Magazine, a well-known periodical of national circulation, published an article entitled, "A General Thins His Ranks," in which it quoted General Watlington as saying, "I cannot and will not tolerate a fat soldier." Life described the program in the following manner:

"When Maj. General Thomas Watlington took command of the 8th Infantry Division at Fort Carson, Colo. last winter he looked over his 20,000 men and came to an appalled conclusion: too many of them were too fat for duty. Unless they slimmed down, he warned the fat soldiers, they would have to be left behind when the unit moved this fall to Germany.

"Most of the 822 men who were found overweight quickly lost enough excess poundage to stay on the roster. But this month 50 of them were still too heavy for the general and some were court-martialed for their failure to lose weight. A few protested to the White House, the Pentagon and their congressmen, and legal officers overruled the general's approach be-

cause there is no Army regulation which makes fatness a crime. But the general did not give up. 'Every man must be a front-line soldier,' he ruled, and, shifting his legal ground, said that some of his fat men would still face court-martial on charges of failing to diet as ordered." [Life, Volume 41, No. 11, at page 87, September 10, 1956. See also Army Times, April 19, 1953 (Eastern edition), pages 8, 10, column 1–2.]

If—and I only accept this as a possibility—the quoted article from Life states accurately the mental attitude of the General, then it is apparent he was determined that all resistance must be crushed and that both administrative and judicial measures would be employed to bring about that result. If at that late stage he was not going to give up, it seems reasonable to suppose that his attitude in the early stages was as adamant. All this smacks of an intense feeling for his objective and we must consider the facts in this case in the light of that attitude. The accused was a member of his command and, as my previous discussion indicates, the charges laid against him were enmeshed intricately with the weight-reducing program. Yet the General issued the order which appointed the accused's court-martial and also acted as convening authority upon the post-trial review. Thus, he was closely connected with all aspects of the legal action which was directed against the accused from the convening of the court-martial until the case reached the board of review level. Where a self-conceived plan is being enforced—either directly or indirectly—which has become synonymous with the name of a commander, prudence suggests that he avoid participating actively in the proceedings against the offender. I am not casting personal aspersions against General Watlington; I am merely suggesting that his enthusiasm for a project, which undoubtedly had a meritorious purpose, together with his expressions, actions, and methods of operation, show a vital interest in compelling subordinates to bend with his will. Under these circumstances he was so closely connected with the prosecu-

tions that any reasonable person would conclude he had a personal interest in their outcome. As we said in United States v Gordon, 1 USCMA 255, 2 CMR 161:

". . . Furthermore, we do not believe the true test is the animus of the convening authority. This undoubtedly was the early rule, but as we view it, the test should be whether the appointing authority was so closely connected to the offense that a reasonable person would conclude that he had a personal interest in the matter. . . . Convening officers should remember that there are easy and adequate means to have a court appointed by one entirely divorced from the offense and if there is any doubt about the propriety of the selection it should be resolved in favor of the accused.

"What we have said about the first question applies with equal force to the second. There are, however, one or two additional reasons which might be added. In a general court-martial the convening and reviewing authorities are the same and if the officer is disqualified from convening he should not be qualified to review. The reviewing authority is vested with great power over the proceedings of a court-martial. He is at liberty to approve or disapprove the finding of guilty or to approve only so much of a finding of guilty of a particular offense as involves a finding of guilty of the lesser included offense, and he has the power to approve or disapprove the whole or any part of a sentence. Such power should not be vested in a person who is interested in the litigation."

The case at bar was factually contested and a finding of not guilty was a possibility. Furthermore, an impersonal convening authority might have concluded not to resort to court-martial proceedings in this instance. To fix with any degree of certainty the General's personal interest in this prosecution is impracticable for he alone knows his mental attitude. But from what has been previously stated, this record is sufficient to cast serious doubt on the

Government's contention that he had only an official interest in the outcome of this case.

To complete my presentation, I must face up to two further problems. It is argued that assuming the General was an accuser in prosecutions flowing directly from violations of his orders in furtherance of the plan, he would not have a personal interest in charges involving a false official statement. As a corollary proposition, it is asserted that any interest he might have in the matter would not prejudice the accused because officers sitting as court members who might not feel free to act in those cases which involved a breach of the program itself, nevertheless would have perfect liberty of thought on a charge of this kind. I concede that the farther the offense is removed from an open violation, the less personal interest the General would have and his open support of his primary objective would have less impact on the court-martial. But such arguments really overlook the practicalities of the situation and in answering the assertions I will consider them in the reverse order.

The members of the court-martial who were to decide the facts, counsel, and the law officer were living in an atmosphere which would hardly be favorable to those who opposed the authority of the creator of the project. I am reasonably certain they would have some mental reservations about not supporting the senior commander and, in a sense, courts under him would revert to the old system of being one of his arms to administer punishment to those who failed along the way. Certainly, when he publicly announced a program to court-martial all offenders he must have created in the minds of his officers his own determination to enforce the program at all costs and the number of hearings bear out that conclusion. When seventy-one hearings growing out of an extraordinary undertaking are ordered in a short period of time, it makes a command conscious of the creator's interest. I am certain from all of the forgoing that the men in the Eight Infantry Division, and particularly those who manned the courts, would pay careful heed to the General's

wishes, for they were well aware of the fact that the project was of paramount importance to him. In this instance, those who were selected were unhappily situated, for a finding of not guilty would have been a direct rebuff to the General, who had ordered the accused to stand trial for violations in connection with his specially cherished project.

The fact that this offense was collateral to the General's project makes him no less an accuser. This official statement arose solely out of, and was so closely tied in with, weight reduction that it is impossible to isolate one form of resistance from another. A false official oath, as an affirmative act of resistance, would have more of a tendency to raise the ire of the General than would a mere failure to lose weight. The former is an act of commission taken to defeat the success of the plan while the latter is only an act of omission. I dare say that in the eyes of the General this offense would be the most serious type of any rebellious opposition, and the record supports that inference, for this incident was the only one out of seventy-one violations which was referred to a general court-martial for trial. When confronted with his pretrial decision, the General was in an inconsistent position. A decision not to order this case to trial would have been a self-defeating gesture and that fairly well makes the issue personal.

In summation of this aspect of the case, I can only say that when I place the act of submitting a false official statement in the perspective of the convening authority's weight-reducing project, I am still convinced that a reasonable person would conclude the convening authority had a personal interest in the prosecution. So that the court-martial may labor in a healthier atmosphere, a rehearing ought to be granted. My brothers have so ordered and I join them in their result.