UNITED STATES, Appellee

v

RUPERT A. DANZINE, Specialist Five, (E–5), U. S. Army, Appellant

12 USCMA 350, 30 CMR 350

No. 14,636

Decided April 28, 1961

*First Lieutenant Robert D. Stiles* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel W. H. Blackmarr*.

*First Lieutenant Francis J. Larkin* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy* and *First Lieutenant Barry L. Kroll*.

## Opinion

GEORGE W. LATIMER, Judge:

Accused was arraigned before a general court-martial convened at Fort Monmouth, New Jersey, on charges of larceny and absence without leave, in violation of Articles 121 and 86, Uniform Code of Military Justice, 10 USC §§ 921 and 886, respectively. He admitted his guilt of the latter offense, but pleaded not guilty to the two larceny counts. He was, nonetheless, convicted as charged and sentenced to dishonorable discharge, total forfeitures, reduction to the lowest enlisted grade, and confinement at hard labor for two years. Intermediate appellate authorities affirmed, and thereafter this Court granted accused's petition for review in order to consider a single issue pertaining to alleged improper command influence.

The facts concerning the substantive offenses which compellingly establish accused's guilt are of no importance to the question before us, so we may dispense with a recitation of them. The instant court-martial was appointed by the convening authority on May 17, 1960. Ten days later and before any cases had been referred to the court for trial, the convening authority and his staff judge advocate each presented a lecture to the court members. The commander's comments were general in nature while those of the legal officer on his staff were largely procedural. Together they offer general guidelines to assist the court members in the performance of their duties. The remarks had been prepared by the staff judge advocate and, prior to presentation, were circulated among the staff, in-

cluding the defense section, for comment. On May 27, 1960, when presented to the members of the court-martial, the lectures were delivered verbatim as written. Accused's case was referred to trial on June 15, 1960, and some two weeks later, on June 28, it came on for hearing. At that time, accused's defense counsel made a motion for appropriate relief, asserting as the basis for redress unlawful command influence arising from the lectures. The law officer denied the motion and the case continued to findings and sentence, thus giving rise to the issue before us.

Appellate defense counsel direct their attack here primarily against the lecture by the convening authority. They note it was given before trial of accused's case and, in addition to the content of his remarks, they object to the fact that he delivered them personally and beamed his comments solely at the members of this newly-appointed court-martial. These latter contentions we may pass over without extended discussion.

We have on prior occasions considered cases involving allegations of improper command influence and, when consideration is given to our holdings in this area, it is obvious that the subject matter of lectures dealing with military justice is the important consideration, and not whether they are delivered personally by the commanding officer nor whether they are given to court members only. See United States v Littrice, 3 USCMA 487, 13 CMR 43; United States v Isbell, 3 USCMA 782, 14 CMR 200; United States v Navarre, 5 USC

**351**

MA 32, 17 CMR 32. See also Article 37, Uniform Code of Military Justice, 10 USC § 837; and paragraph 38, Manual for Courts-Martial, United States, 1951. The proscription against improper command control is not intended to bar responsible officers from appropriately enlighting those who may serve or are serving on military courts. Rather, it is designed to assure military due process of law to those who are brought to justice before such forums. As the Chief Judge stated for the Court in the last above-mentioned case:

"The history of unlawful command influence, and the importance attaching to it in the congressional hearings on the Uniform Code of Military Justice, were fully expounded by this Court in United States v Littrice, 3 USCMA 487, 13 CMR 43. We there discussed the dual purpose of Article 37 of the Code, supra, 50 USC § 612, and pointed out that it was designed to preserve the integrity of military courts without unduly restricting those responsible for the conduct of our military operations. That Article prohibits a convening authority, or other commanding officers, from censuring, reprimanding, or admonishing a court, or members thereof, because of the findings of sentence adjudged. It further proscribes coercing or otherwise influencing a court-martial member by any unauthorized means. Needless to say, this provision of the Code purports to assure to all in the military service an absolutely fair trial in which the findings and sentence are determined solely upon the evidence, and free from all unlawful influence exerted by any military superior. United States v Isbell, 3 USCMA 782, 14 CMR 200." [5 USCMA at page 37.]

And even as recently as United States v Marshall, 12 USCMA 117, 122, 30 CMR 117, this Court adverted to the possibility that convening authorities might find it desirable to comment on certain matters in orientation lectures to courts-martial.

The primary responsibility for the maintenance of good order and discipline in the services is saddled on commanders, and we know of no good reason why they should not personally participate in improving the administration of military justice. No doubt the personal presentation of that subject by the commander is impressive, but that is as it should be. The question is not his influence but, rather, whether he charted it through forbidden areas.

We turn our attention, therefore, to the fundamental question that must be determined in this instance, that is, whether or not the substance of the lectures was proper. It is asserted by appellate defense counsel that the thrust of the comments would influence sentence. In connection with that contention, they isolate one comparison advanced by the convening authority and argue that he was covertly suggesting that offenders be separated from the service. We quote the wording cited by them to support the argument:

". . . When a member of the Army is convicted of a serious offense and given an inadequate sentence, he will often continue to serve in a position of trust and responsibility, simply because practically every job in the Army necessarily involves their exercise in some measure. You should remember that while today a soldier may be remote from serious responsibility, tomorrow all our lives may depend upon him as a member of a team who must be relied on to do his part. A civilian offender, having paid his debt to society, will be returned to his community, but not necessarily to a position of trust or one involving intimate daily contact with him by very many people. In the event he is given responsibility, it will be by the voluntary act of some other member or members of that community. In the military, you or I do not volunteer to place our trust in those around us—we must do so by very reason of the fact that they are serving as members of our organization. On the other hand you must consider in each individual case that we are charged with making all possible use of the trained manpower available to us, and, as you know, we do not have many 'spares.' "

Aside from the fact that the convening authority was stating the obvious, it is to be noted that he ▮▮▮ cautioned the court members that they must in each individual case consider the necessity of retaining trained personnel in the service as the Army was in short supply. Implicit in that remark is a requirement that the court members carefully determine the accused's potential for rehabilitation. But, in addition, that particular comment must be considered in connection with the following admonition given by the speaker:

". . . By proper sentence, I mean proper as *you* see it, based upon the charges made, any circumstances of aggravation, extenuation, or mitigation presented, your own observation of the accused, and your own independent consideration of what you feel is appropriate for this particular accused and the needs of society in his case. By proper sentence, I do not mean one that you may believe that I would want in the particular case, or my Staff Judge Advocate, or any one else. It is your decision alone to make, with due consideration for all the individual and social factors presented. It should not be your concern that any other subsequent action may be taken by the convening authority."

Manifestly, the commander was careful to impress forcefully on the court members that any sentence or portion thereof they should adjudge in a case must be circumscribed by their own independent determination of appropriateness, and that they should solemnly weigh not only that factor but the manpower needs of the Army and an individual's potential for further creditable service before imposing punitive separation. We find no fault in this aspect of the lectures, and hence we reject this branch of the defense argument.

Neither do we perceive any impropriety in the balance of the remarks. They did not suggest probable guilt if cases were referred to trial; the comments did not in any fashion indicate the court members should abdicate their rightful responsibilities in reliance upon corrective action upon subsequent review; they did not touch on similar fact situations, nor in any other way indicate predetermination of a case or any particular finding or sentence therein; neither was there any critical reference to activities by parties to the trial of past, current, or future cases; there was no intemperate or inflammatory language upon military justice matters given to those who heard the lectures; there was no leverage or other device to coerce the court members injected into the remarks; and, last, no specific sentence was suggested, even by indirection. Cf. United States v Littrice, supra; United States v Hunter, 3 USCMA 497, 13 CMR 53; United States v Isbell, supra; United States v Navarre, supra; United States v Deain, 5 USCMA 44, 17 CMR 44; United States v Zagar, 5 USCMA 410, 18 CMR 34; United States v Hawthorne, 7 USCMA 293, 22 CMR 83; United States v Walinch, 8 USCMA 3, 23 CMR 227; United States v McCann, 8 USCMA 675, 25 CMR 179; United States v Lackey, 8 USCMA 718, 25 CMR 222; United States v Shepherd, 9 USCMA 90, 25 CMR 352.

Having mentioned the negative aspects of the lecture, we turn to discuss its positive features. The remarks stressed the importance of the duties of court-martial members and the necessity for fairness and impartiality, both to society and accused persons; exhorted them not to attempt to divine any desires on the part of other authorities; emphasized the freedom of action by court members, completely unbound except by their oaths and the dictates of their own consciences; repeatedly instructed them that the responsibility for correct findings and appropriate sentences—according to their own, not anyone else's standards—rested solely with them; and apprised them in crystal clear language that they need harbor no fear of reprisal arising out of conscientious discharge of their duties. The general tenor of the lectures is illustrated by the concluding paragraphs of the convening authority's remarks. He said:

"In your capacity as members of

a court-martial, you will be exercising a responsibility completely devoid of direct supervision. You will never be called to account for what you do here except as the dictates of your own conscience shall serve as an overseer. The only sanction imposed upon you regarding your functioning as a court member will be the oath that you take before trial and your consciousness of your obligation to see that justice prevails.

"What these observations boil down to, Gentlemen, is this: each case that you consider must be given careful, mature, responsible, and individual treatment. You must decide each case on its facts and reach a conclusion that is fair not only to the Government but also to the accused. In the performance of the duty that lies before you as members of this court-martial, I ask that you guide yourself not by emotional factors, but by evidence legally admitted in court and proved to your satisfaction. In the absence of proved fact, or when guilt is not proved beyond a reasonable doubt, your duty is clear. I ask that you not consider my remarks to be anything more than personal observations I have gathered throughout the years. These remarks are not meant to sway your judgment one way or another in considering any particular case. In fact, at this moment, no case has been referred to you for trial. I hope only that I have been able to impress upon you the importance and seriousness of the duty you are to perform."

Clearly the observations passed to the members of the newly appointed court were not improper.

Having concluded the lectures did not inject improper command influence ▆▆▆▆▆▆▆ ▆ into the picture, we could end our discussion here. But in view of the defense complaints about the timing of the remarks, we deem it appropriate to say a word about that subject. The lectures were not singularly significant as to accused's case, and were given a full month before he was tried. Indeed, neither the instant proceeding nor any

**354**

other had even been referred to trial when the remarks were disseminated to the newly appointed court-martial. As a matter of fact, at the time of the lectures, there was no way for anyone to know just when accused might be tried. He had previously been restricted pending disposition of the larceny charge against him, but had absented himself without authority the middle of April 1960, and he did not surrender until more than a week after the lecture had been delivered. Patently the only significance about the timing of the lectures was that the convening authority desired all court members, before sitting on any case, to be appropriately advised of the serious nature of their obligation and the necessity for absolute impartiality and fairness unfettered by outside influence.

Accordingly, we reject accused's assignment of error and affirm the decision of the board of review.

Chief Judge QUINN concurs in the result.

FERGUSON, Judge (dissenting):

I dissent.

I am of the view that a convening authority may not lawfully address members of a court-martial with respect to the principles of law which they are to apply or the sentences which they should impose. Such action was taken in this case, and it directly violates the mandate of Congress as laid down in Uniform Code of Military Justice, Article 37, 10 USC § 837. Any attempt to influence the course of justice before military courts runs afoul of that statute regardless of the commanding general's motivation, and I fear that our decision today, ignoring the pervasive influence that any commander's views have on the independence of his subordinates, simply makes the prohibition against command control depend upon the cleverness with which he is able to convey his meaning to them.

On June 28, 1960, the accused was found guilty of two specifications of larceny, in violation of Code, supra, Article 121, 10 USC § 921, and one specification of absence without leave, in violation of Code, supra, Article 86, 10

USC § 886. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for two years, and reduction to the lowest enlisted grade. Intermediate appellate authorities affirmed the findings and sentence, and we granted accused's petition for review on the issue whether certain lectures given by the convening authority, Major General William D. Hamlin, USA, and Colonel Richard D. Cleverly, JAGC, his staff judge advocate, constituted the exercise of command control.

On May 17, 1960, General Hamlin appointed a general court-martial to meet at Fort Monmouth, New Jersey, and to hear such cases as might properly be brought before it. On May 27, 1960, he and Colonel Cleverly lectured the new court members in the manner hereinafter depicted. The accused's case was eventually referred to trial before this court-martial on June 15, 1960, and he was duly tried on June 28, 1960. During the preliminary proceedings, the issue of command control was properly raised by a motion for change of venue, supported by copies of the lectures previously delivered to the court members.

General Hamlin's remarks to the court cover three and one-half, legal-sized, single-spaced sheets of paper. Commencing with the comment that he was not attempting to influence his audience with respect to its consideration of "any *particular* case," (emphasis supplied), he offered "some of my own observations which, I believe, will enable you to perform better as court members." His remarks, which also embraced a great deal of relatively harmless material, included the following:

". . . At the same time, gentlemen, while considering your responsibility to be fair to the accused, you must not forget that, as members of the military community, you have an obligation to it and to the nation you represent to make our activities and laws effective. *The court-martial system, when it functions properly and in accordance with law, has an excellent effect on discipline. To have*

*that effect, the sentences handed down by a court should perform the primary function of deterrence, both of the individual accused himself and of other members of the Army, with respect to lawbreaking in the future. Inadequate sentences may be regarded by some as an invitation to disregard the law and lead ultimately to a complete breakdown of discipline. Consider further, if you will, the special problems of this installation as compared to the Army as a whole. Our post is largely populated by transient soldiers who have little time to develop any special regard for their unit or its other members. In such a situation, it is patently more difficult to establish that esprit de corps so important to an effective military command. High morale, and consequently high efficiency, can be encouraged by the just exercise of your responsibility.*

*"I have noticed also in my past experience that court members are sometimes guided in their thinking concerning appropriate sentences by the practises* [sic] *in civilian communities. Not only may such local practises* [sic] *be unsuitable for us because they are either too severe or too lenient, but I urge you also to consider that the military society is a community with many features distinguishing it from the civilian community surrounding it and from those which you may know from personal experience.* First, the Army's standards of honesty and decency must be the highest obtainable because of its structure and mission. The interests of the military community are often different from the interest of society at large. *When a member of the Army is convicted of a serious offense and given an inadequate sentence, he will often continue to serve in a position of trust and responsibility, simply because practically every job in the Army necessarily involves their exercise in some measure. You should remember that while today a soldier may be remote from serious responsibility, tomorrow all our lives may depend upon him as a member of a team who*

**355**

*must be relied on to do his part. A civilian offender, having paid his debt to society, will be returned to his community, but not necessarily to a position of trust or one involving intimate daily contact with him by very many people. In the event he is given responsibility, it will be by the voluntary act of some other member or members of that community. In the military, you or I do not volunteer to place our trust in those around us —we must do so by very reason of the fact that they are serving as members of our organization.* On the other hand you must consider in each individual case that we are charged with making all possible use of the trained manpower available to us, and, as you know, we do not have many 'spares.' " [Emphasis supplied.]

Colonel Cleverly's lecture, extending to about the same length, dealt with the procedures to be employed during a trial by general court-martial, including the voting upon findings and sentence and the role of the law officer. He then added the following extensive comments:

"Now I would like to say a few words about one or two aspects of the deliberations that precede these procedural techniques of arriving at findings and sentences. Findings must relate to the law as it is, not as you might prefer it to be. Until you have studied the historical development of a particular law and its application in past cases, you rarely have an adequate basis for a valid opinion critical of that law. There being no time during the presentation of a case to discuss the merits of the law being applied, you must accept the law as explained by the law officer and conscientiously apply it to the facts that you determine to be proved.

"One troublesome rule of law arises rather frequently and is often misunderstood by court members. That rule concerns the amount of additional proof required for a conviction in a case where a voluntary confession is in evidence—or in other words, proof of the corpus delicti. The area of misunderstanding usually centers on the point of connection of the accused himself with the offense charged. The law holds that the prosecution must establish first, without reference to a confession, that the offense was committed by someone. For example, in the ordinary case, the victim of the offense testifies that at a certain time and place, someone took his car without permission or slashed him with a knife in a cafe brawl or broke into his house during the night. Such evidence is a legally sufficient basis for the admission of a voluntary confession of the accused to the effect that, at the time and place alleged, he was the someone who took the car, or used a knife, or broke into a house. Although the only evidence presented as to the accused being the perpetrator appears in his own voluntary pretrial statement, the law requires no other. In fact, the only basis for the requirement of any other evidence of the crime at all is recognition of the remote possibility that someone might confess to a nonexistent [sic] offense because he desires punishment or publicity for psychological or other reasons. However, the law gives great weight to a voluntary confession because of the obvious truism that a sane person will not voluntarily confess to an actual crime that he did not commit.

*"In deliberations on sentences, my experience has been that occasionally court members express such opinions as, 'Any punishment involving loss of pay or confinement in this case would be unjust because its burden would fall principally upon the accused's family.' If this idea were widely accepted, the principle of equal justice for all accused would perish. The notion that adequate sentences can properly be imposed only on those accused who have no dependents reveals its own absurdity upon merely being stated, although it is the logical corollary of the first idea. Is it any less absurd than the plea of the 17-year-old convicted of murdering his parents that he should receive a*

356

*lenient sentence because he is an orphan? The fact is that the conviction and punishment of nearly every accused hurts someone related to him, psychologically or financially or both. If punishment adjudged by courts-martial is to serve its paramount purpose of deterring the accused and other soldiers from future lawbreaking, it must be adequate in the sense that it is of the kind and amount which will best serve the ends of good order and discipline within the Army, the needs of the accused, and the welfare of society.*

"Please note that in my definition of an adequate sentence there is no mention of any consideration of the cost to the Government involved in executing a sentence. Yet I have heard court members in the past declare that they favored a sentence of dishonorable discharge, but no confinement, for an accused convicted of a vicious offense because they 'didn't believe the Government should spend another dime taking care of such a bum.' Such members have overlooked not only the deterrent purpose of punishment, but also its rehabilitative aim. Rehabilitation means preparation to return to society as a useful citizen—either of the military community or of the civilian one. It is an inescapable obligation of our society, regardless of its cost. When the circumstances of any case indicate that a convicted accused needs the benefits of the Army's penal rehabilitation program, he should be afforded those benefits by means of a suitable sentence to confinement." [Emphasis partially supplied.]

Code, supra, Article 37, provides:

"No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, law officer, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding. No person subject to this chapter may attempt to coerce *or, by any unau-*thorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts." [Emphasis supplied.]

The foregoing section was considered one of the most essential parts of the Uniform Code of Military Justice by the Congress which enacted this salutary legislation. Complaints of command interference were those most often made with respect to the Articles of War and the Articles for the Government of the Navy. Thus, when it became apparent that a new code of military law was required, attention was closely paid to a means of removing the commander from his former all-powerful position *vis-a-vis* the members of a court-martial appointed in his organization. At the same time, it was recognized that he must be allowed to retain some of his former prerogatives in order that he might properly insure that military discipline was enforced in accordance with the law. Of this attempt to balance his powers against the creation of a truly judicial system of military courts, Professor Edmund M. Morgan, Chairman of the Forrestal Committee which originally drafted the Uniform Code, testified before the House Armed Services Committee as follows:

"One important concern of the committee throughout its deliberations was the position of military command in the court-martial system. Secretary Forrestal, in his precept to the committee, instructed us to draft a uniform code, to be uniform in substance and uniform in interpretation and construction, *which would protect the rights of persons subject to the code without undue interference with appropriate military functions.*

"*It was recognized from the beginning by the committee that a system of military justice which was only an instrumentality of the commander was as abhorrent as a system administered entirely by a civilian criminal court was impractical.*

**357**

"We had before us, as I have told you, studies made by various committees in the past and also the testimony presented to this committee in the last Congress. We were aware of the criticisms which had been made against the court-martial system and the defenses that have been put forward in its behalf.

"We were convinced that a Code of Military Justice cannot ignore the military circumstances under which it must operate but we were equally determined that it must be designated to administer justice.

"We, therefore, aimed at providing functions for command and appropriate procedures for the administration of justice. *We have done our best to strike a fair balance, and believe that we have given appropriate recognition of each factor.*

"*Because of the military nature of courts martial, we have left the convening of the courts, the reference of the charges, and the appointment of members to the commander. For the same reason, we have preserved the initial review of the findings and the sentence by the commander.*

"*Having done this, we examined ways and means of restricting the commander to his legitimate functions. We have tried to prevent courts martial from being an instrumentality and agency to express the will of the commander.*

"To make the action of courts martial and the procedure for review free from his influence we have set up an impartial judge for the court martial, made it mandatory that lawyers represent the parties in the general court-martial cases, required the commander to consult before and after trial with his staff judge advocate or law specialist, *and prohibited him from either censuring or reprimanding the court.*" [Emphasis supplied.] [Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, pages 605–606.]

In its report on the proposed Code, the House Armed Services Committee made the following comments with respect to the system which had been devised to eliminate command control:

"Perhaps the most troublesome question which we have considered is the question of command control. Under existing law commanding officers refer the charges in general, special, and summary courts martial and convene the courts; they appoint the members of the court, law officer for general courts and counsel for trial; and retain full power to set aside findings of guilty and modify or change the sentence, but are not permitted to interfere with verdicts of not guilty nor to increase the severity of any sentence imposed. *We have preserved these elements of command in this bill. On the other hand, we have included numerous restrictions on command. The bill . . . makes it a court-martial offense for any person subject to this code to unlawfully influence the action of a court martial.*" [Emphasis supplied.] [House Report No. 491, 81st Congress, 1st Session, pages 7–8.]

Both the House of Representatives and the United States Senate made it quite clear why the term "unlawfully" was used with respect to command influence in their discussion of Code, supra, Article 37, and the reason for the inclusion of the phrase "to . . . , by any *unauthorized* means, influence the action of a court-martial." (Emphasis supplied.) Thus, the report of the Senate Armed Services Committee states:

"This article is not intended to preclude a reviewing authority from making fair comment on errors of the court in an opinion which is made in the course of review, or from returning a record for revision of errors, or from taking appropriate action when a member of a court has so misbehaved as to abandon his judicial responsibilities or duties." [Senate Report No. 486, 81st Congress, 1st Session, page 17.]

From the foregoing, it is quite clear that the Congress, well aware of both the complaints which had been made concerning command control of mili-

tary courts during World War II and in the immediate post-war period and of the necessity to balance considerations of military order and discipline against such control, sought on the one hand to permit commanders to retain some measure of their authority over military tribunals. Thus, convening authorities were permitted to appoint and dissolve courts-martial, to refer cases for trial, and to act on the findings and sentence. At the same time, they were expressly forbidden to influence the judicial acts of any court. Prior to the enactment of the Code, the means most frequently used for this iniquitous practice were the pre-trial lecture, similar in form to that used here, and the post-trial reprimand of court members when their action did not suit the commander. The legislative history quoted above compels the conclusion that Congress intended to outlaw both devices with respect to appointed courts-martial. In short, contrary to the contention of the Government, there is no such thing as *lawful* command control.

The opinions of this Court support the principle that it is improper to lecture an appointed court-martial in the manner here depicted with respect to the performance of its function. In United States v Littrice, 3 USCMA 487, 13 CMR 43, we unanimously condemned a speech to court members which involved the concept that thieves should be eliminated from the service and that justice was insured by careful post-trial review of the proceedings. In United States v Hunter, 3 USCMA 497, 13 CMR 53, the Court condemned a pre-trial conference in which the convening authority personally suggested the verdict and sentence which should be rendered. In United States v Ferguson, 5 USCMA 68, 17 CMR 68, we set aside the findings and sentence when it was disclosed that the court members had attended a conference with the convening authority, his chief of staff, the staff judge advocate, and others in which the command's peculiar problems were discussed and the need for firmness pointed out. The same action was ordered in United States v Zagar, 5 USCMA 410, 18 CMR 34, when it appeared that the court members had been subjected to a general lecture by the staff judge advocate on the impropriety of considering extenuating circumstances on the merits of the case and the probability that an accused had committed the particular offense charged in view of the careful pretrial investigations conducted in each case. Reversal was had despite the fact that *all* court members denied that the lecture would in any manner influence them. Our concluding remarks in that case, at page 417, are worthy of note.

"In conclusion, we reiterate that reversal here is in no degree predicated on doubt of the honesty and integrity of the several members of the court-martial. *It reflects instead an insistence that persons not members of a military criminal tribunal observe the Congressional policy directed against conduct tending to impair the freedom and impartiality of the judgment of the court's members.*" [Emphasis supplied.]

In United States v McCann, 8 USCMA 675, 25 CMR 179, we also held that prejudice resulted from the delivery of a lecture by a staff judge advocate to court members in which certain acts of misconduct, including one similar to that charged against the accused, were characterized as being more reprehensible in the military community than in civilian life. Finally, in United States v Olson, 11 USCMA 286, 29 CMR 102, we sustained the contention that command influence was present when, among other things, it appeared that five court members previously had attended an officers' orientation lecture in which the high incidence of bad check charges within the command and the need for positive action to improve its record were emphasized, the particular accused being tried upon specifications alleging the utterance of forged checks. In reversing, we stated, at page 289:

". . . Thus, we have sought to maintain a 'delicate balance between justice and discipline.' United States v Littrice, supra, at page 491. What a few commanders fail to realize, however, is that the scales always become loaded against justice when

lectures attended by court members involve extended discussion of offenses identical or closely related to those for which an accused is shortly to be tried. See United States v McCann, supra. *In such instances, the respect for command authority ingrained in the average officer predisposes him to judge the accused in the light of the needs of the service rather than impartially to consider the charges and the evidence. The result is drumhead justice—a situation which may as adversely affect discipline and morale as the offenses which originally led to the pretrial lectures.*" [Emphasis supplied.]

One thread is apparent throughout the foregoing opinions and, indeed, in all of our cases which deal with the issue of command control. This Court has never heretofore upheld a trial by court-martial in which a lecture was delivered by the convening authority, or his staff judge advocate, or both, to the members of an appointed court-martial. Rather, its affirmances have been limited to the situation in which such lectures were delivered to all members of a command without regard to their forthcoming service as military jurors. United States v Isbell, 3 USC MA 782, 14 CMR 200; United States v Navarre, 5 USCMA 32, 17 CMR 32; United States v Carter, 9 USCMA 108, 25 CMR 370. I suggest that the distinction thus drawn by the Court has rested on a twofold basis. First, command control goes to the very heart of the military justice system and, with respect to pretrial lectures to court members, untoward influence must not only be prohibited *per se* but also the "appearances which are certain to sap public confidence in the essential fairness of military law administration" must be avoided. United States v Zagar, supra, at page 414. Second, when a lecture is delivered to a court-martial, as such, "the respect for command authority ingrained in the average officer predisposes him to judge the accused in the light of the needs of the service rather than impartially to consider the charges and the evidence." United States v Olson, at page 289.

These considerations are applicable to this record. Here, both General Hamlin and Colonel Cleverly lectured the members of the court after it was appointed. True, this event occurred before accused's case was referred for trial, and the lectures were not specially directed to the charges against him. It is equally apparent, however, that the principles to which both officers adverted were intended to apply to *all* cases to be tried by this court-martial. Indeed, the Government concedes, both in its brief and upon oral argument, that the speeches were intended to influence the actions of the court members. This is an obvious conclusion, for there was no other reason for their delivery. Thus, a deliberate attempt was made to appeal to the members' tendency to obey the commands of their general and to permit his views to influence their judicial acts. Code, supra, Article 37; United States v Zagar, supra. It is almost unnecessary to add that both evil and the appearance thereof flow from the procedure followed here.

One need not, however, rely upon the mere fact that the convening authority and his staff judge advocate saw fit to lecture appointed military jurors concerning their performance of duty. Reference to the specific remarks involved also demonstrates the inherently prejudicial effect of their appearance before the court. Thus, General Hamlin adverted to the "special problems" which affected Fort Monmouth and the fact that it was largely populated by "transient soldiers." He emphasized the necessity of imposing sentences which would provide the deterrent he considered essential and suggested that reliance upon civilian sentencing practices was unsuitable. Finally, he drew attention to the "many features" distinguishing military society from civilian society, and emphasized that retention of an offender in the armed services necessitated his restoration to "a position of trust and responsibility" whereas, in civil life, whether the accused was permitted to occupy such employment depended upon the reaction of the other, law abiding members of his community.

However carefully phrased, these comments by General Hamlin were di-

rected to only one end, and that was to emphasize the necessity of severe sentences and the particular need for imposition of punitive discharges. Moreover, the remarks were grossly inaccurate in that they left the court members with the impression that failure to separate an accused punitively would necessitate his return to duty in a position involving the success of the Army's mission. This completely ignores the Army's rather detailed procedures for the administrative separation of undesirable and inapt personnel. See AR 635–208 and AR 635–209. It also gives weight to one factor which affects the measure of punishment without attention to the other, more laudable purposes which should be considered in adjudging a sentence appropriate for both the accused and the armed service concerned. Finally, we have held that consideration of local conditions and the imposition of "inadequate sentences" as factors to be considered in determining sentence were erroneous when included within the law officer's advice to the court concerning the maximum penalty. United States v Mamaluy, 10 USCMA 102, 27 CMR 176; United States v Horowitz, 10 USCMA 120, 27 CMR 194; United States v Brennan, 10 USCMA 109, 27 CMR 183. We have also held it prejudicial to include such remarks in a pretrial lecture to the court members. United States v Ferguson, supra. Thus, it is apparent to me that General Hamlin's references to sentence matters and implication that punitive discharges were needed require reversal here.

Colonel Cleverly's remarks seem equally harmful, albeit for an additional reason. While his comments with respect to adequacy of sentences also concealed the iron fist of retribution if proper punishments were not forthcoming, he took upon himself the additional burden of instructing the court members concerning the rules of law to be applied in considering confessions. Yet, we have heretofore held that a staff judge advocate may not inject legal advice into a court-martial's proceedings and have continuously sought to require that the law applied by the members come from the law officer alone. United States v Guest, 3 USCMA 147, 11 CMR 147; United States v Knudson, 4 USCMA 587, 16 CMR 161; United States v Smith, 12 USCMA 127, 30 CMR 127. I am aware that reference was made during the lecture to the necessity of applying only those principles of law given to the court by the law officer, but if this was intended as an effective advice, rather than as protective coloration, why should the staff judge advocate think it either desirable or necessary to instruct the members of the court on legal matters prior to the occasion on which they convened? Here, I am of the view that the same principle which we applied in United States v Guest, supra, and United States v Knudson, supra, must be invoked and that we should unhesitatingly condemn Colonel Cleverly's attempt to dictate to the court members concerning applicable principles of law. Only in that manner can we be certain that the law officer's function of instructing the court, granted him alone by Code, supra, Article 51, 10 USC § 851, governs their deliberations.

Turning to the rationale of the principal opinion, it is apparent that much of what I have already stated establishes the basis of my fundamental disagreement with its author. In essence, he believes some command control of court-martial proceedings is both desirable and necessary. In my opinion, all such measures are forbidden by Code, supra, Article 37, with respect to the members of an appointed tribunal, and experience dictates that they are unnecessary when the convening authority is empowered to select and appoint the members of the court and to refer such charges to it as he, operating under the limitations imposed by the Code, sees fit.

I call attention also to the fact that the decisions of this Court upon which the principal opinion relies involve one of three factors and, therefore, do not support its reasoning. The first is that those cases which we have affirmed deal only with instructions delivered to members of a command as a whole as opposed to the members of a particular court. United States v Isbell, supra; United States v Navarre, supra. Those

which concerned lectures to court members as such have been unexceptionally set aside. United States v Littrice, supra; United States v Hunter, supra; United States v Zagar, supra; United States v McCann, supra. The third classification involves matters relating to the convening authority's personal interest in the particular trial, the use of departmental policies to extort a particular type of sentence, or other considerations completely foreign to the issues before us. United States v Dean, 5 USCMA 44, 17 CMR 44; United States v Hawthorne, 7 USCMA 293, 22 CMR 83; United States v Walinch, 8 USCMA 3, 23 CMR 227; United States v Lackey, 8 USCMA 718, 25 CMR 222; United States v Shepherd, 9 USCMA 90, 25 CMR 352.

Nor does our comment in United States v Marshall, 12 USCA 117, 30 CMR 117, offer any support for the proposition that the convening authority or his staff judge advocate may instruct the members of a court-martial concerning their duties. There, we stated, at page 122, with respect to taking corrective measures concerning the failure of members to remain impartial throughout a trial:

". . . For example, counsel might proffer correctly phrased instructions to the president at the outset of the trial, in which court members would be reminded of their duty to maintain an open mind until their deliberations commence. *Convening authorities or other appropriate officials might consider inclusion in orientation lectures of material relating to the proper use of the court's interrogative privilege.*" [Emphasis supplied.]

It should be apparent to even the casual reader that the Court there had reference, not to speeches to particular courts, but to the general studies in military justice commanded by the directives of every armed force and to the information disseminated to all members of a particular command concerning the same subject. See United States v Isbell, supra; United States v Carter, supra. Moreover, the opinions of this Court, now including almost

twelve volumes, and those of the boards of review, extending to almost thirty volumes, indicate beyond cavil that pretrial lectures to court members deal, not with the necessity for impartiality, but almost exclusively with the need for severity.

With respect to the timing of the lectures, I suggest that whether accused's case had been referred to the court-martial for trial is not the governing consideration. If so, then reversal could always be avoided by the simple device of delaying this ministerial act until after the convening authority's speech had been completed. As a matter of fact, information properly before us under the doctrine we announced in United States v Ferguson, supra, indicates that cases were referred to this court for trial commencing with the first working day following the lectures. It continued to hear charges against various accused until this defendant's turn on the docket came to pass. Be that as it may, I am convinced that the record before us demonstrates a violation of Code, supra, Article 37, less serious perhaps than some which we have seen, but which nonetheless requires reversive action.

In sum, then, I am of the view that Congress sought deliberately to balance the commander's responsibility for military discipline and morale with the accused's entitlement to receive a fair and impartial hearing before a truly judicial body. It accomplished this salutary objective by reserving certain rights to the convening authority and, at the same time, prohibiting him from directly making his wishes known to the members of an appointed court. Congress well knew the consequences of a commanding general speaking directly to a court-martial, and I cannot believe it was so naive as to permit lectures such as these to be delivered. In short, the effect of our holding here is to allow the convening authority, through his pretrial admonitions, to be spiritually present in the deliberation room of every court-martial to which he addresses himself. Finally, the content of the lectures given these court members satisfactorily establishes General Hamlin's intent to compel severe sen-

362

tences and Colonel Cleverly's desire to advise the members with respect to the law—the latter a clear usurpation of the field exclusively reserved for the law officer. I cannot agree that command control, under the principles I deem governing, was not present here, and I must, therefore, record my dissent to the decision of my brothers.

I would reverse the decision of the board of review and order a rehearing.